PETERSON v. RAILROAD.

(Filed December 4, 1906).

*Railroads—Permissive Licensees—Degree of Care Required —Wanton Injury.*

1. A railroad company by carrying on its cars venders of fruits for sale to its passengers does not invite or induce the public to enter into them at a station for the purpose of making purchases, and the fact that without objection on the part of the company persons usually went into the cars for the purpose of buying fruit cannot amount to more than a permissive license.

2. Where the plaintiff went into the train at a station for the sole purpose of purchasing fruit without invitation or inducement, but simply by the silent acquiescence of defendant's agents, he was a mere permissive licensee, and took the risk incident to the movement of the train, and, in the absence of any wanton injury, the motion for nonsuit should have been allowed.

ACTION by Moses Peterson against South and Western Railway Company, heard by *Judge C. M. Cooke* and a jury, at the April Special Term, 1906, of the Superior Court of MITCHELL.

Moses Peterson, on his own behalf, testifies: "I was at Huntdale, in this county, 2 May, 1903. I went up on the train to that place and got off about 12 o'clock; the train returning passed there about 5 or 6 on its way to Johnson City. I live in Yancey County, and was about to start home on my wagon when the train came on, but while it was stopped at station I went on the train to purchase some lemons. It

was a mixed train, and I got on a freight car where the lemons were. There was a door on each side. There were steps to the door and up which I went. Moses Wilson and Van Adkins went on with me. There was a man in there standing in one corner and had lemons and some other fruit to sell. They were in the rear end of the car. The car doors were about four feet wide. Both doors were open. I reached him a dollar and told him to give me three lemons. He says, 'The train is going to start in a minute.' I says, 'Well, hand me the dollar and I'll get out of here.' He handed me the dollar, and as he reached it to me it dropped on the floor. I stooped down to pick it up. The train started and gave a jerk and threw me out of the door. I had picked up the dollar and was straightening up when the train gave the jerk. There was no signal given of the movement of the train either by the bell or whistle. It threw me five or six feet to the door and out of the door on the ground. The door was nearly four feet from the ground, and I fell five or seven feet from the car on my left side and leg, and broke both bones in my left leg. I don't know that it was the custom of the railroad company to sell lemons and other fruit from that car. It was the first time I had ever been there. I was not intoxicated. I had only taken one drink that day; that was just before dinner. When the jerk came I was five or six feet from the door, towards the back end. Adkins and Wilson were both out before I was thrown. When the man said 'The train is about to start,' they went out the other door from the one I was thrown out. The train had been delayed at the stop at that station for about half an hour on account of their screwing up some parts of the engine. I did not get out when the others got out because I wanted my dollar. It dropped on the floor. I can't say whether the man dropped it or I."

Enoch Bennett testified: "I don't know that the railroad company kept fruit for sale in the car, but I know that some-

body sold fruit in that car, for I have purchased it there myself, and I have seen other people than passengers get things in there. They would go in there and come out eating oranges or other things. I was there for four months. There was no alarm given of the starting of the train that I know of. I was near enough to have heard it. It was the custom of the train at that point to give notice before starting. It started that day with a sudden jerk. There were two or three trains a day passing along there. I can't say whether the bell rang or the whistle sounded the 3d of May, but was the common thing for them to do it. I don't know whether the car had doors in the ends or not. I think Moses went in the side of the door."

J. R. Hughes testified: "It was the general custom that they sold fruit in them at the different stations. They sold oranges, lemons, and other fruits. They had been selling that way for two or three months. What I saw of people purchasing fruit was generally they went to the door and the fruit was handed out to them, but I had seen persons that I remember now go in the car and purchase the fruit. I saw it sold, besides Huntdale, at Poplar Station and Relief; the first once, the last twice. Part of the time they would ring the bell or the conductor would throw up his hand and holler 'All aboard!' The train started out faster than I ever knew it to do before. I think I recollect that the conductor was in such a position sometimes that he could have seen people who went in the car to purchase fruit."

Moses Wilson testified: "I went in car with plaintiff. He went in first. There were end doors to the car, and I went up the steps and in at one of the end doors. When I got near the man who was selling the fruit, he said, 'The train is going to start.' Peterson says, 'Hand me my dollar.' I started to get off the car. I went at once and went through the front end door and down the steps. I was four or five steps from the

end door.  Directly I got off, the train started and seemed to start sudden.  I had just cleared the steps.  It seemed to be a sudden jerk, a little more than common.  It was for two or three weeks the general custom for people to go in car to purchase fruits and ginger-pop.  I had bought these myself.  Sometimes at the door; sometimes, when I thought I had time, I would go inside.  The selling of fruit from the car had been carried on in the previous summer, not so much in the winter months.  They kept ginger-pop on ice in the summer.  They did not keep ice there in winter.  There are no side steps to the side doors.  I had just passed in the car and gone some two or three steps when the man told me the train was going to start.  The man said, 'The train is going to start in a minute, boys; get off.' "

Plaintiff rests.  Defendant moves for judgment of nonsuit. Refused, and defendant excepts.  From a verdict and judgment for plaintiff, defendant appeals.

No counsel for the plaintiff.
*J. Crawford Biggs* for the defendant.

CONNOR, J., after stating the case:  The plaintiff was neither a passenger nor an employee.  He had no contractual relation with defendant, hence it owed him no contractual duty; nor did defendant owe him any duty in respect to its business as a carrier of passengers.  The rights and duties of the parties are therefore not, in any degree, affected by the fact that defendant was employed in the business of a common carrier.

For the purpose of disposing of the exception presented upon the appeal, the car was the property and under the control of defendant, subject to the same power of management as the premises of a private citizen.  Taken in the light most favorable to the plaintiff, he was upon the car by virtue of a permissive license in the pursuit of his own business, with

which defendant had no connection or concern. It cannot be successfully contended that, by carrying on its cars venders of fruit and confectionaries or newspapers for sale to its passengers, the company invites or induces the public to enter into them at stations for the purpose of making purchases. Besides being foreign to its legitimate business, to do so would seriously interfere with its power to discharge the duty imposed by law, to carry passengers with all reasonable dispatch and safety.

It is not necessary to hold, nor do we hold, that plaintiff was a trespasser, although we see no good reason why the defendant's agents and employees may not have forbidden plaintiff to enter the car for the purpose of buying fruit, just as a private citizen may forbid any person to come upon his premises. His failure to do so is no more than a permissive license. If there be any evidence of an existing custom by which persons were in the habit of going into the car at stations for the purpose of buying fruit, it is very slight. It is very doubtful whether, when analyzed, there is any evidence of such custom. One witness, who undertakes to so testify, says: "What I saw of people purchasing fruit was, generally, they went to the door and the fruit was handed out to them; but I had seen persons, that I remember now, go in the car and purchase fruit. At Huntdale once and Poplar Station twice." Another witness says: "It was for two or three weeks the general custom for persons to go in the car and buy." The plaintiff says that he had never heard of such a custom. It was the first time he was ever there. It would impose hard lines upon the owner of premises—and, in respect to the plaintiff, the defendant occupies that position—if by permitting persons, in a few instances, to enter thereupon for their own purposes or convenience, a custom or usage should be established, imposing upon such owners the degree of care imposed in the case of invited guests or persons going in for the purpose of transacting business with the owners.

*Winder v. Blake,* 49 N. C., 332; *Penland v. Ingle,* 138 N. C., 456; 12 Cyc., 1028.

Discussing the question involved in this appeal, *Boynton, J.,* in *Pitts., etc., Railroad v. Bingham,* 29 Ohio St., 270, says: "It is therefore a right that the public have to enter upon the premises of the company at points designed or designated for receiving passengers, and upon compliance with the rules governing the transportation of persons to be carried over its road to such points thereon as they may desire. The right of the public to enter is coextensive with the duty of the company to receive and carry. It, however, cannot be extended beyond this. For all purposes not connected with the operation of its road, the right of the company to the exclusive use and enjoyment of the corporate property is as perfect and absolute as that of an owner of real property not burdened with public or private easements or servitudes."

Conceding, however, that there was evidence sufficient to be submitted to the jury, and that they found in accordance therewith, nothing more is shown than that, without objection on the part of defendant, persons usually went into the cars for the purpose of buying fruit: it cannot, as matter of law, amount to more than a permissive license, and in respect to the duty imposed upon the owner to one thus entering, the rule is well settled. "A licensee who enters upon premises by permission only, without any enticement, allurement or inducement being held out to him by the owner or occupant, cannot recover damages for injuries caused by obstructions or pitfalls. He goes at his own risk and enjoys the license subject to its concomitant perils. * * * Here permission is neither inducement, allurement, nor enticement." *Pitts., etc., Railroad v. Bingham, supra.*

In a case involving the same principle, *Burbank v. Railroad,* 42 La. Ann., 1156 (11 L. R. A., 720), *McEnery, J.,* says: "It is not stated in the petition, nor is there any evidence to show that the plaintiff was in the habit of going to

the train to solicit custom for her boarding-house. * * *
Her presence on the platform, and at the depot, was not for
the purpose of transacting any business with the company
* * * or for any purpose for which the depot had been
built. She was at the depot, it is true, by a general license
from the company, in the absence of any express prohibition.
It would not be practical for a railroad company * * * to
designate particular individuals who should be permitted to
enter its depot. But there was no express or implied invita-
tion to the plaintiff to go to the depot and on the platform.
* * * There must have been, on the part of the company,
such gross and wanton negligence that it was equivalent to
intentional mischief," to make it liable.

We had occasion to discuss the question regarding the meas-
ure of duty which defendant owed the plaintiff, as a mere
permissive licensee, in *Quantz v. Railroad,* 137 N. C., 136,
and find that the conclusion reached in that case is sustained
by the additional authorities cited by the learned counsel for
defendant.

Is there any evidence of a breach of duty or the absence of
the degree of care imposed upon defendant not to wantonly
injure plaintiff? The reason why it is negligent, in respect
to passengers, to so manage the engine approaching or leaving
a station as to suddenly jerk the cars, arises out of the duty
of the engineer to know and keep in mind the fact that pas-
sengers and those who are entitled, by reason of relationship
or otherwise, to accompany them, are usually in the act of
going upon or leaving the car at stations. *Nance v. Railroad,*
94 N. C., 619; *Tillett v. Railroad,* 118 N. C., 1031; *Denny
v. Railroad,* 132 N. C., 340. No such reason existed in
respect to persons going upon the cars for purposes having
no connection with the business of defendant as a carrier of
passengers. The engineer cannot be presumed to know that
persons are using the car for other purposes than as passengers
or employees. If he were required to await the pleasure or

convenience of all persons who, from curiosity or other cause, were upon the cars, the common complaint of belated trains, with all of the attendant inconvenience, damage and dangers to travelers, would increase more than tenfold. To require the company to keep guards at the doors of their cars to prevent persons going in for other than proper purposes would be impracticable. It is well known that the cars are for passengers, and that, save within the exceptions noticed, no one else is entitled, as of right, to go into them. In many towns and cities, ordinances are made prohibiting persons, having no business, from going upon cars. In the absence of such ordinances, the only reasonable and workable rule is that which the law prescribes—in respect to passengers the highest degree of care in the handling and movement of trains; in regard to mere permissive licensees, abstention from wanton injury. It is hardly possible to move a train of cars, especially a mixed train, as this one, without some jerk or jolt. *Smith v. Railroad,* 99 N. C., 241. Persons going upon them must take notice of the necessity of some jerk or jolt when the train moves. Of course if the conductor or any one having control of the train had seen the plaintiff on the car he should have warned him that it was about to move. It is said, however, that no signal was given that the train was about to leave the station. More than one answer may be given to this suggestion; the defendant owed no duty to plaintiff to give a signal; again, the plaintiff was told that the train would leave "in a minute." He does not claim that he did not have time to get off; the fact is, that the other persons who went in with him did get off safely. The cause of his injury was that either he or the fruit vender dropped the coin, and plaintiff was trying to recover it, thereby delaying his movement in leaving the car. Certainly the engineer could not be expected to know that some one was on the car buying lemons, that a coin had been dropped and that it would require some time to recover it; nor is there any evidence that any one

connected with the train knew that plaintiff was on the car. The fruit vender, who was on the same car, is not shown to have been jerked or jolted. The evidence that the jerk was any more severe than was proper or necessary in moving the train, as "made up," was very slight.

The plaintiff when he went into the car, on his own business, without invitation or inducement or, as he says, any knowledge of any custom for persons to do so, but simply by the silent acquiescence of defendant's agents, took the risk incident to the movement of the train.

In the absence of any evidence of breach of duty on the part of the defendant, the motion for nonsuit should have been allowed. For refusal to do so the judgment must be reversed. *Hollingsworth v. Skelding,* at this term.

Reversed.