On 5 November, 1931, about 1:30 p.m., on a clear day the deceased, an old man eighty-eight years of age, undertook to cross the defendant's tracks near Canton. He approached the track on the south side and was walking in a footpath across said track. The roadbed was on a fill eight or twelve feet in height and the path led up to the track. From the west to the point of collision is a steep grade. An eye witness offered by plaintiff said: "He came across from the south side and walked upon the bank. As he got upon the top of the railroad fill he turned and walked with his back to the train down the railroad. The last time I saw him he started across the track — he never did stop — just went right straight across the track — he just kept going with his head kinda down looking this way. He was just walking along and *Page 531 
looking in the same direction all the time — he walks pretty glib. . . . He was making the last step off the track on the north side when the pilot beam hit him in the head. . . . I heard the train blow back up the track. . . . If he had looked up the track after he got up the fill, he could have seen the train I feel sure. I have said that all the time. I can't say anything but that. . . . Not a thing to keep you from seeing up the track. . . . I was sitting on a wall in my kitchen yard at the time the accident happened, . . . 150 yards from the place where Mr. Young was hit. . . . From the time I saw him walking up there, walking along, he walked on and never changed his head at all, kept walking the same way all the time. I never saw him turn his head or change it."
The plaintiff offered as a witness a civil engineer, who made a blue print of the surroundings. This witness testified: "That trial led up an embankment about eight feet high. When he got up there he had a space to walk over after he got to the top of the embankment approximately eight or ten feet to the track — that eight or ten feet was level with the top of the fill. . . . When he got within eight or twelve feet of the track, exactly like pointed out to me, the space was perfectly level, and I could see the straight track running east and west. Looking east it is 1,100 feet to the first Wellstown crossing — that was perfectly straight and down grade. The train was not coming in that direction — they told me it was coming in the other direction. Standing in that space — say two feet from the end of the cross tie, where they showed me Mr. Young walked up, looking due west, the way the train was coming, I imagine you could see up that track between two or three hundred yards anyway. A man walking just the way they showed me Mr. Young was walking as he approached the railroad track before he went on the track, if he had looked in the direction the train was coming, could have seen the train at least 200 yards. I could have seen that train in the direction it was coming, I would say 200 yards at any point from the top of the fill to the railroad a distance of eight or twelve feet there, if he had looked in the direction the train was coming. Six or eight feet before he got to the end of the ties he could have seen two or three hundred yards, if he had turned his head and looked in the direction the train was coming. I think that outhouse is the nearest obstruction looking west from the railroad track — it is something like twenty-five feet from the track. . . . This little outhouse sits something like 25 feet south of the track, and sits on lower ground than the track. . . . There is no house, no bushes, no growth of any kind that would obstruct the view of a man from six to eight feet of the track right where Mr. Young went on, looking west for two or three hundred yards . . . at any point six to eight feet before Mr. Young *Page 532 
went on the track looking in the direction the train was coming, that would obstruct his view 200 yards. He had to walk the width of the fill six or eight feet before he could go on the track. He could see two hundred yards then after he walked up and got on this bank that was immediately level with the railroad, . . . and if he had looked in the direction the train was coming I am sure that there was no outhouses, no fence, no trees, or anything that would obstruct his view for two hundred yards."
The evidence tended to show that when the engineer of the train reached the top of the cut west of the point of the collision, he cut off the steam and the engine was coasting down grade at a speed of some 35 or 40 miles an hour, and hence not making a lot of noise. There was evidence that no signal was given of the approach of this rapidly moving passenger train.
The engineer and fireman testified that as soon as they discovered that plaintiff's intestate was about to enter upon the track they sounded the whistle, put on the emergency brake, and used every available means to stop the train or slacken its speed. There was no evidence tending to show in what distance this passenger train could have been stopped under the circumstances existing at the time.
The cause was tried in the county court upon issues of negligence, contributory negligence, last clear chance and damages. The jury answered the issue of negligence "Yes"; the issue of contributory negligence "No"; the issue of last clear chance "Yes," and awarded damages in the sum of $2,325.60. The defendant appealed to the Superior Court upon exceptions duly taken. The trial judge overruled certain exceptions so taken by the defendant and sustained others. One exception sustained was for the failure of the judge of the county court to nonsuit the case. Another was to the submission of an issue of last clear chance to the jury in the county court. It was further ordered that the judgment of said county court . . . is hereby set aside and declared null and void, . . . and that a certified copy of this judgment be transmitted to the said General County Court of Buncombe County to the end that judgment may be entered by the said court, dismissing this action as in case of nonsuit. From the foregoing judgment plaintiff appealed.
The evidence tells in substance, the following story: A pedestrian, an old man, walking briskly, in a much used footpath in a populous community, approaches a live track of the defendant at about *Page 533 
one o'clock in the daytime. The roadbed was about eight feet high, and at the top of the embankment there was a level space of 8 or 10 feet between the edge of the embankment and the track. When the pedestrian reached a point within eight or twelve feet of the track, he could see 1,100 feet to the eastward and within a distance of six or eight feet from the track he could see to the westward "two or three hundred yards." A passenger train is approaching from the west, coasting down a steep grade at the rate of 30 to 40 miles an hour. The pedestrian, still following the footpath, steps upon the track and in the act of crossing, is crushed by the locomotive, which it is assumed, failed to give proper signals.
The accepted principles of law applicable to the facts preclude recovery. Davidson v. R. R., 171 N.C. 634, 88 S.E. 759; Holton v. R.R., 188 N.C. 277, 124 S.E. 307; Pope v. R. R., 195 N.C. 67,141 S.E. 350; Bailey v. R. R., 196 N.C. 515, 146 S.E. 135; Krouse v. R. R.,197 N.C. 541, 149 S.E. 923; Tart v. R. R., 202 N.C. 52,161 S.E. 720.
Affirmed.