PRISCILLA DEAN WAGONER, ADMINISTRATRIX OF THE ESTATE OF WALTER HASLEY WAGONER, v. NORTH CAROLINA RAILROAD COMPANY AND SOUTHERN RAILWAY COMPANY.

(Filed 23 September, 1953.)

**1. Trial § 22a—**

On motion to nonsuit, the evidence is to be considered in the light most favorable to plaintiff and plaintiff must be given the benefit of every inference which the testimony fairly supports.

**2. Negligence § 23—**

Ordinary negligence is based on negligent conduct under circumstances in which probable injury should have been foreseen; wanton and willful negligence rests on the assumption that the negligent party knew the probable consequences of his act but was recklessly, wantonly or intentionally indifferent to the results.

**3. Negligence § 4f (3): Railroads § 5—**

Where pedestrians walk up and down and across tracks in a railroad yard for a number of years, a pedestrian so using the yard is a licensee and not a trespasser.

**4. Negligence § 4f (3)—**

The owner of property owes the duty to a licensee upon his premises not to increase the hazard by active and affirmative negligence.

**5. Railroads § 5—**

Evidence tending to show that an engineer made a flying switch, and that the coal car so shunted ran over and killed a licensee on a track at a place wholly within the railroad company's yard, near the center of a city, while sufficient to support an issue of negligence on the part of the railroad company, is insufficient to support an issue of wanton negligence on its part. The distinction between the act of a railroad company in making flying switches within its freight yard, and in making flying switches at public crossings, is pointed out.

**6. Same—**

Where the evidence discloses that a licensee in defendant's freight yard was struck and killed by a shunted freight car on a fair day, and that the licensee's view was not obstructed when he walked upon the track, such licensee is guilty of contributory negligence as a matter of law barring recovery for his death even though the car which struck him was moving noiselessly so that he could not hear it.

**7. Negligence § 10—**

In order for plaintiff to invoke the doctrine of last clear chance, he must plead it.

**8. Same—**

The doctrine of last clear chance does not apply if the party injured is guilty of contributory negligence as a matter of law.

APPEAL by the defendants from *McLean, Special J.,* November Term 1952. ALAMANCE.

Civil action for damages for wrongful death resulting from the alleged actionable negligence of the defendants.

The plaintiff offered evidence; the defendants did not. These facts are admitted in the pleadings. The North Carolina Railroad Co. is a North Carolina corporation, and is now, and was at the time complained of, the owner of a railroad from Goldsboro to Charlotte, which includes a right of way 200 feet in width through Burlington with roadbeds, railroad tracks, spur tracks and buildings located thereon. The Southern Railway Co., a Virginia corporation, prior to the death of plaintiff's intestate had leased the railroad from its codefendant, and at the time complained of was operating and using the railroad property in its business as a common carrier of passengers and freight for hire, under the lease.

The plaintiff's evidence is summarized below. The plaintiff's intestate, Walter Hasley Wagoner, about 2:00 p.m. 21 May 1951 was killed in the freight shifting yard of the Southern Railway at Burlington, North Carolina, when two wheels of a single detached coal car passed over his body cutting it in two. The area of the railway freight yard between the Main Street and Lexington Avenue Crossings has six railway tracks. The track next to the Freight Depot is known as the House Track, the next track north is known as the Short Track, the next north as the Main Track, the next north as the Passing Track, the next north as the Dead Track, the next north as the Spur Track. On the south side of the Freight Depot next to Webb Avenue there are four Spur Tracks. We are concerned with the area north of the Freight Depot which has six tracks. The distance between the Main Street Crossing and the Lexington Avenue Crossing was 300 steps, according to one witness: according to another about 575 to 650 feet. The Lexington Avenue Crossing is east of the Main Street Crossing. The Passenger Station is on the west side of the Main Street Crossing and the Freight Depot is on the east side of the same crossing. The Freight Depot is on the south side of the railway tracks. There is a continuous platform or connected building all the way along the south side of the railway tracks for the entire distance from the Main Street Crossing to the east beyond where Wagoner was killed. In the same area there are a shed and sandpit near the Spur Track. One sentence in the Case on Appeal states the sand loader is located near the Spur Track; the next sentence says it is between the Spur Track and the Dead Track. Out in this track area there is a small house "where the firemen headquarter there," and there is an unloading place for cattle. These are located between the Spur Track and the Dead Track. Between the Dead Track and the Freight Depot Building on the south side of the House Track there are no other structures in the area between the Main

Street and Lexington Avenue Crossings out on the tracks. Wagoner was killed on the track known as the Short Track about 225 or 250 feet west of the Lexington Avenue Crossing. The distance from the body under the coal car west to the Main Street Crossing was about 350 or 400 feet. This area is bounded east, west, north and south by public streets, and is within a block and a half of the center of Burlington. The area is surrounded by the Freight Depot, the sandpit, the cattle loading zone and the coal yards. Across the streets which surround this area are many stores and places of business. It is about 150 or 175 feet from the south edge of the freight yard over to the northern edge of the freight yard. The general area of the freight yard is level. There are no fences or gates on North Main Street or Lexington Avenue to keep people out of this area: nor any fence or gate along the north of the area.

The rails of the Short Track are level with the ground; its cross ties are completely bedded in the ground. The height of the Main Line is above the level of the other tracks: the rail does not stand above the ground. The distance between the north rail of the Short Track and the south rail of the Main Track is about ten feet, or as another witness said wide enough for an automobile to pass. West of the point where Wagoner was killed, the Short Track joins the Main Track.

From the point where Wagoner was killed looking east toward Lexington Avenue one could see down the tracks about a quarter of a mile. Standing at the Main Street Crossing and looking east toward Lexington Avenue one can see in the neighborhood of four blocks.

When Vestal Long reached the body under the coal car there were some other cars on the Short Track west of where the body was. Long testified, "I do not think there were any east of that back toward the engine, only the one coal car. I don't remember seeing any cars on the Main Track just north of this Short Track." He also testified "there were some cars on the siding track between me and the switch engine." There were no cars between where Wagoner's body was and the sandpit. There were some cars on the House Track along where the body was.

Vestal Long and Maynard Coleman were the only eyewitnesses. On 21 May 1951, about the middle of the day, Long was working at the sandpit unloading sand with a conveyor. About the lunch hour the Southern Railway was moving a sand car, and threw it off the track. Long helped put the car back on the track with the help of the shifting engine. About 2:00 p.m. Bray with this engine went on down the track. A lot of sand had been spilled along the conveyor. Long was using the bulldozer moving backward and forward in his work. About 2:00 p.m. Long saw Wagoner near the Dead Track watching him work—he saw him there 20 or 30 minutes. Wagoner had a particular interest in mechanical things. At this time Long saw the shifting engine east of Lexington

Avenue Crossing placing cars, pulling out from one track going into another. This engine was carrying cars back down the line, and pulling them into other places. Long testified: "I saw them push a car in there on the Short Track . . . The coal car was detached from the shifting engine at the crossing or below it. When I say at the crossing or below the crossing, I mean east of Lexington Avenue. The coal car was moving west on the Short Track. If there was a brakeman on top of it, I didn't see him. I didn't see any employee of the railroad company down the Short Track west of Lexington Avenue. The empty coal car was not moving very fast, it was barely moving. The next time I saw Mr. Wagoner the second set of truck wheels rolled off his body, the third set rolled up on him and stopped. A coal car has eight wheels, two front ones, a little ways back two more . . . I did not see the first set of wheels crossing the body . . . I went to the place where his body was. His body was on the north rail of the Short Track . . . I did not see him at all from the time I saw him standing watching me work until I saw him under the wheels. I didn't see him cross there." Long saw the brakeman, and believed he was coming from in front of the engine near the crossing. The point where Long found Wagoner's body was just a little farther east toward Lexington Avenue from where Long had seen him standing watching him work. When Long saw this detached coal car coming down the Short Track he did not hear any train whistle, and did not see any signal given. Long couldn't hear this coal car making any noise, as he was running the bulldozer, which makes more noise than an automobile.

Maynard Coleman was hauling sand and stone. He drove into the railway yard from Main Street, and went across the tracks to the conveyor, which was loading sand. He crossed the Spur Track right at the conveyor. The first thing he saw, when he reached the sandpit, was a man's leg move under a hopper coal car. This coal car was on the Short Track. Coleman did not see anybody on the coal car, nor anyone around the area. No engine was attached to the car. There were no cars on the tracks either way according to Coleman's testimony. The car was just stopping still, when Coleman saw it. The body of Wagoner was under the third set of wheels of the car—those are the ones near the back when the car was moving west. Coleman helped to move the car off the body.

Wagoner's body was cut in two across the stomach. The upper part of his body from the waist up was on the inside of the Short Track between the rails. The lower part of his body was on the outside or north side of the north rail of the Short Track.

Wagoner lived on Kime Street in Burlington about eight blocks southwest of the Main Street Crossing. Wagoner worked for the Central Grocery Co., which is one block north of the railway tracks on North Main Street.

Wagoner was 47 years old at the time of his death. He was killed about 2:00 p.m. The weather was fair and the sun shining.

D. D. Matthews, Chief of Police of Burlington, testified he had read an ordinance against loitering around the railroad yard.

Vestal Long testified he has seen "quite a few people" crossing the railway yards between the Main Street and Lexington Avenue Crossings —some were railway workers, some not: he has seen children ride bicycles through there, and has seen people who worked there run them off.

For more than 14 years there has been much pedestrian traffic in the railroad yard between the Main Street and Lexington Avenue Crossings. During the school period pedestrian traffic in that area is heavy. The traffic is mostly between the Main Track and the Short Track. Chief of Police D. D. Matthews testified that he frequently observed the area between the Main Street and Lexington Avenue Crossings and that "over a period of time prior to 21 May 1951 I observed pedestrians there practically all the time, walking up and down the railway tracks, crossing **practically every day and every night."**

The plaintiff introduced from Paragraph 3 of the defendants' further answer the following, limiting it to the fact of death resulting from a railway car switch operation on the tracks of the defendants: "Plaintiff's intestate negligently, carelessly and heedlessly walked into a railroad car switch operation being conducted wholly within said railroad yard, and that all injuries suffered by plaintiff's intestate on said date and while in said railroad yard, were solely and proximately caused and brought about by the negligence and unlawful conduct of plaintiff's intestate."

The following issues were submitted to the jury: (1) Is the plaintiff the duly appointed administratrix of her alleged intestate?; (2) Was the plaintiff's intestate injured and killed by the willful or wanton negligence of the defendants, as alleged in the complaint?; (3) What damages, if any, is the plaintiff entitled to recover?

The jury answered the first issue Yes; the second issue Yes; and awarded substantial damages under the third issue.

From the judgment signed in accordance with the verdict the defendants excepted and appealed.

*Cooper, Long, Latham & Cooper for plaintiff, appellee.*

*Long & Long, W. T. Joyner, and H. E. Powers for defendants, appellants.*

PARKER, J. The defendants assign as Error No. One the denial of the defendants' motions for nonsuit made at the close of the plaintiff's evidence. The defendants offered no evidence. The defendants further assign as errors the court's refusal to submit issues of negligence and

contributory negligence, as requested by the defendants, and the court's submitting only the issue as to willful or wanton negligence; and also assigns as errors parts of the charge, and part of the argument of one of counsel for the plaintiff.

We shall discuss first the motions for judgment of nonsuit, for if those motions should have been allowed, a discussion of the other assignments of error will become academic.

The duty of the court in passing upon a motion for nonsuit has been stated so frequently and so clearly, that to attempt to restate it would be like carrying coal to Newcastle. Suffice it to say that on such a motion the court interprets the evidence in the light most favorable to the plaintiff, and gives to him the benefit of every inference which the testimony fairly supports. *Cox v. Freight Lines,* 236 N.C. 72, 72 S.E. 2d 25; *Graham v. Gas Co.,* 231 N.C. 680, 58 S.E. 2d 757.

The plaintiff appellee in her brief states "our case was bottomed upon the doctrine of that conduct on the part of the railroad which amounts to wantonness, willfulness, or the like, precluding the defense of contributory negligence."

These two questions are first presented. First, considering the evidence as set forth above in the light most favorable to the plaintiff, was it sufficient to show that the defendants committed an act of willful or wanton negligence in detaching a car from the shifting engine at or east of the Lexington Avenue Crossing, and without anyone on the car and without any signal or warning, and without any employee of theirs being in the yard to warn anyone of the moving car, letting it move at a slow speed on its Short Track entirely in their freight yard and on their property, under the conditions then and there existing? Second, if the evidence was not sufficient to show willful or wanton negligence, was it sufficient to show that the defendants were guilty of ordinary negligence?

"An act is wanton when, being needless, it manifests no rightful purpose, but a reckless indifference to the interests of others; and it may be culpable without being criminal." *Wise v. Hollowell,* 205 N.C. 286, 171 S.E. 82. "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." *Foster v. Hyman,* 197 N.C. 189, 148 S.E. 36.

"The term 'wanton negligence' . . . always implies something more than a negligent act. This Court has said that the word 'wanton' implies turpitude, and that the act is committed or omitted of willful, wicked purpose; that the term 'willfully' implies that the act is done knowingly and of stubborn purpose, but not of malice . . . Judge Thompson says: 'The true conception of willful negligence involves a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another, which duty the person owing it has assumed by contract

or which is imposed on the person by operation of law. Willful or intentional negligence is something distinct from mere carelessness and inattention, however gross. We still have two kinds of negligence, the one consisting of carelessness and inattention whereby another is injured in his person or property, and the other consisting of a willful and intentional failure or neglect to perform a duty assumed by contract or imposed by operation of law for the promotion of the safety of the person or property of another.' Thompson on Neg. (2d Ed.), Sec. 20, *et seq.*" *Bailey v. R. R.,* 149 N.C. 169, 62 S.E. 912.

To constitute willful injury there must be actual knowledge, or that which the law deems to be the equivalent of actual knowledge, of the peril to be apprehended, coupled with a design, purpose, and intent to do wrong and inflict injury. A wanton act is one which is performed intentionally with a reckless indifference to injurious consequences probable to result therefrom. Ordinary negligence has as its basis that a person charged with negligent conduct should have known the probable consequences of his act. Wanton and willful negligence rests on the assumption that he knew the probable consequences, but was recklessly, wantonly or intentionally indifferent to the results. *Everett v. Receivers,* 121 N.C. 519, 27 S.E. 991; *Ballew v. R. R.,* 186 N.C. 704, 120 S.E. 334; *Foster v. Hyman, supra; S. v. Stansell,* 203 N.C. 69, 164 S.E. 580; 38 Am. Jur., negligence, Sec. 48.

"In strictly accurate use, the terms 'willfulness' and 'wantonness' express different ideas and are clearly distinguishable, the distinction resting chiefly in the nature and extent of intent involved. It has been said that 'the difference is that between him who casts a missile intending that it shall strike another and him who casts it where he has reason to believe it will strike another, being indifferent whether it does so or not.'" 65 C.J.S., Negligence, p. 379.

The plaintiff vigorously contends that the movement of the detached coal car under all the circumstances was willful or wanton negligence on the part of the defendants, and quotes copiously from the opinion in *Johnson v. R. R.,* 163 N.C. 431, 79 S.E. 690, and also cites and relies upon *Wilson v. R. R.,* 142 N.C. 333, 55 S.E. 257; *Vaden v. R. R.,* 150 N.C. 700, 64 S.E. 762; *Farris v. R. R.,* 151 N.C. 483, 66 S.E. 457; 151 A.L.R., p. 37; 167 A.L.R., p. 1253; and other authorities. The defendants as vigorously contend otherwise.

Our following cases are where a detached car movement caused injury or death at a *public crossing. Bradley v. R. R.,* 126 N.C. 735, 36 S.E. 181 (the view was also obstructed by a line of boxcars on a sidetrack); *Wilson v. R. R., supra; Johnson v. R. R., supra; Lutterloh v. R. R.,* 172 N.C. 116, 90 S.E. 8 (a 12-year-old boy). In the *Johnson* case the Court said: "This Court has recently declared, in *Vaden v. R. R.,* 150 N.C. 700,

that, 'making flying switches' on the railway tracks and sidings running across and along the streets of populous towns is *per se* gross negligence, and has been so declared by all courts in this country and by text-writers generally. It is stated in one of the best known textbooks that the use of a running switch in a highway in the midst of a populous town or village is of itself 'an act of gross and criminal negligence on the part of the Company,' " citing authorities. In *Lutterloh v. R. R., supra*, this Court stated: "It is established with us by repeated decisions that it is negligence *per se* to make one of these flying switches along the streets of populous towns or at public or much frequented crossings," citing the *Johnson case, supra*, and others. In the *Lutterloh case* issues of ordinary negligence and contributory negligence were submitted to the jury, as well as in the *Bradley* and *Wilson cases*.

In *Vaden v. R. R., supra*, a 13-year-old boy was struck and killed by a flying switch about 30 feet from where Tomlinson Street crosses the tracks. He was killed on a switch track located in a populous part of High Point immediately in front of a factory where he worked. The factory had just closed for the day, and employees were filling the streets and crossings. Issues of negligence and contributory negligence were submitted. *Brown, J.*, wrote the opinion for the Court.

In *Bordeaux v. R. R.*, 150 N.C. 528, 64 S.E. 439, these facts appeared from the evidence. Plaintiff's intestate was a car repairer employed in defendant's switching and repair yards at South Rocky Mount. To protect its workmen the defendant had long since adopted and published rules requiring those repairing cars on tracks in the yards to place a blue flag on the car to give notice to the switch enginemen not to move cars or run other cars in on them. The intestate with two fellow-workmen went to repair a tank car on Track No. 1. There was much shifting on the yard tracks at the time. They decided it was a short job, and put out one person to watch, who failed to do so. While the intestate was under the car repairing it, the switch engine "kicked" or "pitched" a car loaded with lumber on to Track No. 1, which struck another car, and that against the tank car, running it over intestate and killing him. It was a custom of long standing in the yards, and well known, that if the job was short, the flag was not put out. *Brown, J.*, speaking for the Court wrote: "We admit that the rulings of the Court in regard to 'kicking' cars, or making flying switches at public or much frequented crossings, do not apply to the constant changing or switching of cars that is inevitable in the extensive repair and switch yards of a large railway system." Issues of ordinary negligence, contributory negligence and damages were submitted to the jury.

In *Farris v. R. R.*, 151 N.C. 483, 66 S.E. 457, these facts appeared. The intestate was an employee of the defendant. He was walking down

a space 6 to 8 feet wide between the first and second tracks of the defend-
ant in a busy yard of the defendant in Asheville. An engine on the third
track passed him from behind blowing off his hat, which fell on the second
track. He stopped to pick it up and was run over and killed by four
gondola cars coming from behind. The engine had made a "flying
switch," and the four coal cars were sent on the second track. Issues of
ordinary negligence, contributory negligence, last clear chance and dam-
ages were submitted. The Court said quoting 3 Elliott on R. R. (2d Ed.),
sec. 1265G: "The practice of making running or flying switches is in-
herently dangerous, and is considered by the Court in numerous decisions.
The Courts have not hesitated to hold railroad companies liable for
injuries to trespassers, on the track, thus inflicted, on the grounds of
negligence. The case of this negligence seems specially plain where the
cars are sent in swift motion, with no one at the brakes, upon switch
tracks commonly used by persons for foot paths and crossings, without
objection from the company, though not a public crossing. It would seem
a duty owed by the railroad company, even to trespassers, to station look-
outs in such positions on the moving cars, that they can watch ahead of
them and warn persons thereon of their danger."

See *Hudson v. R. R.,* 142 N.C. 198, 55 S.E. 103, where a flying switch
was made into a spur track in the yard of an oil company. An employee
of the oil mill was killed. Issues of negligence and contributory negli-
gence were submitted to the jury.

In *Bordeaux v. R. R., supra,* it is recognized that an accident in a rail-
road yard and on its property caused by a flying switch presents quite a
different problem from accidents caused by flying switches across and
along the streets of populous towns or villages. After a thorough search
we have been able to find only a few cases that deal with flying switches
in a busy railroad yard. The text-writers' references to the subject are
meager.

"It is a negligent act to send detached cars along a railroad track, with-
out adequate means of control and with no warning signal, at a place
where it is the duty of the railroad company to keep a lookout for people
who are likely to be using the track; and where such negligent act results
in the infliction of personal injuries, the railroad company is liable for
the injuries. And under some circumstances the company may be held
liable though the negligent act is committed in its own yard, and though
the person injured is a trespasser or a licensee." 10 Anno. Cases Note
on p. 18, citing many authorities.

It is said in 44 Am. Jur., Railroads, Sec. 454: "The practice of making
flying switches or of kicking detached cars along a railroad track without
adequate means of control and with no warning at a place where persons
are likely to be on the track has been universally condemned by the courts

as constituting negligence, as where the cars are shunted or kicked along a track across which persons are constantly passing on a well defined pathway. Under some circumstances the company may be held liable though the negligent act is committed in its own yard, and though the person injured is a trespasser or a licensee . . . It cannot ordinarily be said that it is negligence *per se* for a railroad company to make a "running," "flying," or "gravity" switch in its yard in a city, at a point where its tracks neither occupy nor cross a street . . ." See also 75 C.J.S., Railroads, p. 287; *Hawkins v. Beecham,* 168 Va. 553, 191 S.E. 640.

It is said in 167 A.L.R. Anno. p. 1273: "Although the cases are not in complete accord, most courts that adhere to the general rule that imposes a duty of reasonable care on the part of the railroad company toward persons using a path across railroad tracks where that use is a long continued and general one, apparently acquiesced in by the railroad company, take the position that the mere fact that the crossing in question is one over the railroad tracks in the railroad yards or is one over railroad switching tracks, does not necessarily make one using the crossing a trespasser or bare licensee and relieve the railroad company from the duty of keeping a lookout for such person and of exercising due care to avoid injuring him." Citing numerous cases. It is further stated in the Anno. p. 1277: "It is, of course, necessary in order to raise any general duty on the part of the railroad company to look out for persons using footpaths leading across its railroad yards, to show a general and notorious use of the crossing through the yards for such length of time as to raise an inference of knowledge and acquiescence on the part of the railroad company from which an invitation or license to cross may be implied."

Apparently the intestate was in the railroad yard to watch a derailed car being put back on the rails by the switch engine and a bulldozer, as he had a particular interest in mechanical things. Over a period of 14 years pedestrians, and during school times children, have been walking up and down the tracks in the yard and crossing the tracks in the yard, practically every day and night.

The evidence classifies the intestate as a licensee in the freight yard. *Murphy v. Murphy,* 202 N.C. 394, 162 S.E. 901; *Gibbs v. R. R.,* 200 N.C. 49, 156 S.E. 138; *Peterson v. R. R.,* 143 N.C. 260, 55 S.E. 618; *Willis v. R. R.,* 122 N.C. 905, 29 S.E. 941.

In *Brown v. R. R.,* 172 N.C. 604, 90 S.E. 783, it is said: "In *Troy v. R. R.,* 99 N.C. 298, *Davis, J.,* held that where the public had been 'in the habit for a series of years of using the track, with the acquiescence of the defendant, this amounts to a license or permission and imposes upon the railroad company the duty to exercise care on that account.'"

In *Norris v. R. R.,* 152 N.C. 505, 67 S.E. 1017, the Court said: "It has been repeatedly held with us that . . . where a person is on the track,

at a place where travellers are habitually accustomed to use the same for a walkway, they have a right to rely, to some extent and under some conditions, upon the signals and warnings to be given by trains at public crossings and other points where such signals are usually and ordinarily required, and that a failure on the part of the company's agents and employees operating its train to give proper signals at such a point, is ordinarily evidence of negligence; and where such failure is the proximate cause of an injury it is, under some circumstances, evidence from which actionable negligence may be inferred."

As to a licensee the duties of a property owner are substantially the same as with respect to a trespasser. But a vital difference arises out of conditions which impose upon the owner of property the duty of anticipating the presence of a licensee. If the owner, while the licensee is upon the premises exercising due care for his own safety, is affirmatively and actively negligent in the management of his property or business, as a result of which the licensee is subjected to increased danger, the owner will be liable for injuries sustained as a result of such active and affirmative negligence. *Jones v. R. R.,* 199 N.C. 1, 153 S.E. 637.

At the time the detached car movement began near or east of Lexington Avenue no one was in the freight yard except the intestate, and possibly Long on the bulldozer. The intestate was on or near the Dead Track when last seen before being seen under the coal car. The coal car was coming down he Short Track. Between these two tracks were the Main Track and the Passing Track. There was nothing to obstruct the intestate's view. He was 47 years old; it was 2:00 p.m.; the day was fair; the yard was generally level. There is no evidence where the intestate was, when the car was detached. There was no brakeman on the coal car; no whistle or signal was given of its movement. If the intestate had remained on or near the Dead Track during the movement of the coal car, he would not have been killed.

Considering the evidence in the light most favorable to the plaintiff, and giving to the plaintiff every inference fairly to be drawn therefrom, we think there is no evidence that the defendants had actual knowledge, or that which the law deems to be equivalent of actual knowledge, that the intestate was in a position of peril, and designedly, purposely and intentionally killed him, and that there is no evidence that the defendants under the circumstances intentionally made the detached car movement with a reckless indifference to the rights of the intestate and others.

While there is no evidence of willful or wanton negligence on the part of the defendants, considering the evidence that for 14 years or more pedestrians day and night walked up and down the tracks in the railroad yard, and all the other facts, we do think there is evidence from which actionable negligence may be inferred.

The defendants have pleaded the contributory negligence of the plaintiff's intestate as a bar to recovery. The learned counsel for the plaintiff most adroitly selected the doctrine of willful or wanton negligence as their battlefield in an endeavor to preclude the defense of contributory negligence. The approach of the detached coal car was totally unobstructed for a distance of a quarter of a mile. There existed no unusual conditions created by the defendants tending to distract and divert the attention of a man of ordinary prudence and self-possession from the duty of looking and listening for an approaching train or car. It is not a case of sudden peril, imminent danger and emergency not brought about by the negligence of the intestate. *Pope v. R. R.,* 195 N.C. 67, 141 S.E. 350. The intestate was 47 years old; it was 2:00 p.m.; it was fair and the sun shining. The freight yard was level. The presumption of due care on the part of the intestate is repelled by the evidence which shows that the intestate must have seen the coal car if he had looked, in time to have prevented the accident. If the coal car was moving noiselessly, that would not relieve the intestate of the duty of looking. *Dowdy v. R. R.* and *Burns v. R. R.,* 237 N.C. 519, 75 S.E. 2d 639; *Godwin v. R. R.,* 220 N.C. 281, 17 S.E. 2d 137. The car was barely moving when the intestate was run over. It is the centuries old story of those who "have eyes to see, and see not." Ezekiel, Ch. 12, v. 2. *Davidson v. R. R.,* 171 N.C. 634, 88 S.E. 759.

The intestate, a pedestrian, in the *daytime,* got upon the Short Track, in the freight yards of the defendants, the view of which was totally unobstructed, and was killed by a detached car barely moving, and did not look; that was negligence on the part of the intestate, and such negligence was the proximate cause of the intestate's death precluding recovery of damages by the plaintiff, even if the car was moving noiselessly so he could not hear it. *Rimmer v. R. R.,* 208 N.C. 198, 179 S.E. 753; *Young v. R. R.,* 205 N.C. 530, 172 S.E. 177; *Tart v. R. R.,* 202 N.C. 52, 161 S.E. 720; *Coleman v. R. R.,* 153 N.C. 322, 69 S.E. 251, where it is said: "The doctrine that such negligence bars recovery has been consistently recognized by this Court in at least thirty-five cases beginning with *Parker v. R. R.,* 86 N.C. 221, and ending with *Mitchell v. R. R.,* this term."

The plaintiff's case is not saved by the doctrine of last clear chance. In the first place it was not pleaded. In order to invoke this doctrine, the plaintiff must plead and prove that the defendants, after perceiving the danger, and in time to avoid it, negligently refused to do so. *Bailey v. R. R.* and *King v. R. R.,* 223 N.C. 244, 25 S.E. 2d 833; *Hudson v. R. R.,* 190 N.C. 116, 129 S.E. 146. Second, if the plaintiff had pleaded this doctrine, there is no evidence in the case to support the allegation. Further, *Stacy, C. J.,* speaking for the Court in *Rimmer v. R. R., supra,* says

this doctrine does not apply when the contributory negligence of the party injured, as a matter of law, bars recovery, citing *Redmon v. R. R.,* 195 N.C. 764, 143 S.E. 829. To the same effect *Dowdy v. R. R.,* and *Burns v. R. R.,* 237 N.C. 519, 75 S.E. 2d 639; *Sherlin v. R. R.,* 214 N.C. 222, 198 S.E. 640, in which many cases are cited; *Ingram v. Smoky Mountain Stages, Inc.,* 225 N.C. 444, 35 S.E. 2d 337.

For the reasons stated above we are of the opinion, and are impelled to hold, that the motions for judgment as in case of nonsuit duly lodged by the appealing defendants should have been allowed. It, therefore, follows that the judgment below must be reversed, and it is so ordered.

Reversed.