ROBERT D. STARR AND ROBERT D. STARR, GUARDIAN *AD LITEM* FOR BRETT R. STARR v. JOHN G. CLAPP, JR., AND GLADYS C. CLAPP

No. 7818SC185

(Filed 6 March 1979)

1. **Negligence § 60— duty to trespassers**

   The duty owed trespassers on one's premises is that they must not be willfully or wantonly injured.

2. **Negligence §§ 7, 45— cable across private driveway—injury to minor motorcyclist—no willful or wanton negligence**

   In an action to recover for injuries sustained by minor plaintiff when he drove his motorcycle into a cable gate on a private driveway on defendants' farm, the evidence was insufficient to support a jury verdict finding that plaintiff was injured as a result of willful or wanton conduct on the part of defendants where it showed that minor plaintiff was a trespasser on the property; defendants erected the cable gate across the driveway to protect their property from trespassing motorists; defendants did not know that minor plaintiff or anyone else had ever ridden a motorcycle on their property; and the cable was visible from a distance of 100 to 180 feet away.

   Judge HEDRICK dissenting.

Starr v. Clapp

APPEAL by defendants from *Graham, Judge*. Judgment entered 22 November 1977 in Superior Court, GUILFORD County. Heard in the Court of Appeals 28 November 1978.

*Booth, Fish, Simpson, Harrison & Hall, by E. Jackson Harrington, Jr., and Konrad K. Fish, for plaintiff appellees.*

*Henson & Donahue, by Daniel W. Donahue, for defendant appellants.*

VAUGHN, Judge.

The minor plaintiff was awarded $12,500 for damages sustained when he drove his motorcycle into a cable gate on a private driveway on defendants' farm. The jury found that he was injured by the "willful or wanton negligence of the defendants." The sole question presented is whether the court erred in failing to grant defendants' timely motions for directed verdict and for judgment notwithstanding the verdict. A majority of this panel of judges is of the opinion that the evidence fails to show that plaintiff's injuries were sustained as a result of any willful or wanton conduct on the part of defendants.

[1] Whether defendants' conduct was "willful or wanton" was properly selected as the standard by which that conduct must be judged. The duty owed a person on the premises of another depends upon, among other things, whether that person is an invitee, licensee or trespasser. *Hood v. Queen City Coach Co.*, 249 N.C. 534, 107 S.E. 2d 154 (1959). "The duty owed to trespassers is that they must not be willfully or wantonly injured." *Jessup v. High Point, Thomasville and Denton Railroad*, 244 N.C. 242, 245, 93 S.E. 2d 84, 87 (1956). "As to a licensee the duties of a property owner are substantially the same as with respect to a trespasser; but an essential difference arises out of conditions which impose upon the owner or occupant of property the duty of anticipating the presence of a licensee." *Jones v. Southern Railway*, 199 N.C. 1, 3, 153 S.E. 637, 638 (1930).

An act is said to be wanton "when, being needless, it manifests no rightful purpose, but a reckless indifference to the interests of others." *Wise v. Hollowell*, 205 N.C. 286, 289, 171 S.E. 82, 84 (1933). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference

to the rights of others." *Foster v. Hyman,* 197 N.C. 189, 191, 148 S.E. 36, 37-38 (1929). The term "wanton negligence" always implies more than negligence. It implies turpitude. "Ordinary negligence has as its basis that a person charged with negligent conduct *should have known* the probable consequences of his act. Wanton and willful negligence rests on the assumption that he *knew* the probable consequences, but was recklessly, wantonly or intentionally indifferent to the results." (Emphasis added.) *Wagoner v. North Carolina Railroad,* 238 N.C. 162, 168, 77 S.E. 2d 701, 706 (1953).

We now review the evidence as it relates to the foregoing principles. Plaintiffs called as their first witness the defendant, John Clapp, whose testimony in material part, was as follows. In January, 1975, he and his wife purchased the 100 acre farm on which the accident occurred. It adjoins a 130 acre tract owned by his parents. Defendants did not live on the property and usually were on the premises only on weekends. At the time of the accident there was an old unoccupied dwelling on the property. It was located some distance from any public road, and defendants reached the dwelling over a private dirt and gravel driveway that ran in a northerly direction from the public road. Defendants' agreement with Carl Pegram, the former owner, provided that Pegram could occupy the old dwelling for ninety days after the sale. Pegram experienced some delay in his plans and was allowed to remain on the property until September of 1975. After defendants purchased the property, they suffered considerable harassment from trespassing motorists. On at least two occasions, Mrs. Clapp was in the old house painting when strange male trespassers drove up in automobiles. Defendants also had problems with trespassers dumping trash, including beer cans and whiskey bottles. Clapp posted a "Private Road, Keep Out" sign at the entrance to the property. He also put up several signs along the driveway reading, "Warning, Posted Land, No Trespassing, Violators Can Be Prosecuted." Some of the signs were black and red metal, others were of multi-colored plastic and others were of cardboard. After Pegram moved away in September, defendants decided, in late September or early October, to block the driveway with a cable gate in an effort to stop the trespassing motorists. Clapp decided that he would block the driveway at what he considered the most logical spot. An aluminum cable,

formerly used by the telephone company and three-eighths of an inch in diameter, was attached to a pine tree on the east side of the road. The cable then ran about ten or twelve feet across the road and was attached to a post defendants planted in the edge of a seven acre field. The gate was locked at the end that was affixed to the telephone post. The cable swung about three feet off the ground in the center but was slightly higher at the ends. It was located down the road from defendants' property line so as to take advantage of an open field that was on one side of the road. The gate site was about 180 feet from where one would come out of a curve and could be seen by one coming down the road for that distance. The gate was from one eighth to one quarter of a mile from the old house. The sole purpose of installing the gate was to try to prevent people in automobiles from driving over the defendants' property. Clapp used cable for the gate because he had the cable on hand and because of its convenience. Neither of the defendants had ever seen the minor plaintiff or any other motorcyclists, bicyclists or horseriders on their property. Clapp said that he had no reason to know that plaintiff or anyone else with a motorcycle had ever been on his property.

Plaintiff then called Dr. R. T. Copeland, a Greensboro veterinarian who, along with G. S. Patrick, went to defendants' farm on the afternoon of 16 November 1975. The pair, with the written permission of defendants, frequently visited the farm to plant bird patches, release quail and train hunting dogs. Dr. Copeland was familiar with the bad situation that defendants faced with reference to trespassing motorists. He had seen carloads of trespassers parked on the property and had seen their discarded beer cans, wine bottles and other litter. On one occasion, he had taken his wife out to watch the dogs run, but she did not want to stay because of that situation. He was also familiar with the numerous signs that were posted warning people to stay off of the property because it was privately owned. He described the cable across the driveway as being a "shiny aluminum cable" and said that it was plainly visible to one coming down the driveway for at least 180 feet. As was their custom, they parked the truck just south of the barricade and started walking down the driveway. They then saw plaintiff lying on the ground ten or fifteen feet north of the cable and the motorcycle about fifteen feet north of plaintiff. Plaintiff was unconscious and had scrapes and

bruises on his chest and neck. An ambulance was called, and plaintiff was taken to the hospital.

The minor plaintiff took the stand in his own behalf. He knew nothing about what caused him to wreck his motorcycle. In fact, he did not remember riding it on the day that he was injured. He had, however, ridden his trail bike on the property many times before Pegram, the former owner, moved. He said, however, that the road had gotten "old" to ride on. By getting "old" he meant that he had ridden on it "so many times it was getting dull, nothing to it." At times in the past, he had also ridden on the property in the company of other people on motorcycles. The last time he remembered riding on the property was about a month before the accident. He did remember seeing a new "No Trespassing" sign about two months before the accident. He understood that Pegram had given him permission to ride on the property and did not know that Clapp had purchased the property until after the accident.

The minor plaintiff's grandfather, Ralph Stubblefield, also testified for the plaintiff. He operates a garage on McConnell Road almost directly across the road from the entrance to defendants' private farm road. He knew Carl Pegram, the former owner. With Pegram's permission he, his daughter and his son-in-law, had ridden horses on the property. His wife had ridden a motorbike on the property in the presence of Pegram about a year before the accident. As a result of a conversation with Pegram, Stubblefield told the minor plaintiff that he could ride his trail bike on the Pegram farm. He knew, however, that Pegram had sold the farm and he helped Pegram move away. He did not know until after the accident that his grandson had been on the property after Pegram moved. While operating his garage, he saw quite a few cars go in and out of the driveway leading to the house on defendants' farm. He had, however, never seen any other type of vehicles go in or out. When he helped Pegram move, there were no signs posted along the driveway, and the signs had to have been put up after Pegram moved. He learned of the accident after his grandson had been taken to the hospital. He went to the scene to identify the motorcycle. He returned the next day and looked at the cable from a distance of eighty feet. He had to look closely to see it because it blended in with the sun and the background. If he had not known it was there, he would not have seen it.

There was no reflective device, rag or anything else on the cable. The cable was not bright. There were soybeans about two and one-half feet high in the field west of the cable. All the leaves were off the beanstalks, and they had turned brown. The sun was shining brightly on the day of the accident.

After their motion for a directed verdict was denied, defendants offered the testimony of James Fryar, an ambulance driver. He testified that upon arriving to answer the emergency call, he saw the cable when he was at least 100 feet away and had no difficulty in doing so. He also recalled seeing a series of "No Trespassing" signs as he proceeded down the driveway to the scene of the accident. Trooper Bullard of the Highway Patrol went to the scene of the accident and testified that the cable was extremely shiny and that he had no trouble seeing it as he approached. Defendants also offered the testimony of G. W. Patrick who was with Dr. Copeland when the accident was first discovered. He testified that the cable could easily be seen from a distance of 180 feet. There were a number of "No Trespassing" posters that were signed by Mr. and Mrs. Clapp. Defendant, Gladys Clapp, also related the problems she and her husband had experienced with trespassing motorists. She did not know plaintiff and did not know that he or anyone else had ever ridden motorcycles or bicycles on the property.

The duty of the court in passing upon a motion for a directed verdict

> "has been stated so frequently and so clearly, that to attempt to restate it would be like carrying coal to Newcastle. Suffice it to say that on such a motion the court interprets the evidence in the light most favorable to plaintiff, and gives to him the benefit of every inference which the testimony fairly supports." *Wagoner v. North Carolina Railroad, supra,* at 167.

[2] The evidence discloses that defendants erected a cable gate on a private road owned by them and that plaintiff, while riding a motorcycle, crashed into that gate and seriously injured himself. The evidence, however, falls far short of showing that defendants, as they erected and maintained the gate, *knew* that the minor plaintiff would probably run into the gate and, notwithstanding that knowledge, were recklessly, wantonly or intentionally indif-

ferent to the probable result. The evidence discloses that the gate was erected to meet a legitimate need and to serve a rightful purpose. It was a reasonable means for defendants to employ in order to protect their property from trespassing motorists. The evidence further discloses that defendants did not know (or even have reason to suspect) that plaintiff or anyone else had ever ridden a motorcycle on their property. Even plaintiff's grandfather who operated a business across the road from defendants' private driveway never observed anything other than automobile traffic go in or out of defendants' driveway. Finally, it is very clear that we are not here faced with a situation where a landowner, expecting the arrival of trespassers, deliberately creates an inherently dangerous condition and leaves it with a deceptive appearance of safety in order to trap or harm the intruders.

In summary, the evidence fails to disclose that defendants breached a duty they owed plaintiff. They are, therefore, not responsible for his injuries, as unfortunate as they may be. The judgment should have been directed in favor of the defendants. The judgment for plaintiff is vacated, and the case is remanded.

Vacated and remanded.

Judge ARNOLD concurs.

Judge HEDRICK dissents.

Judge HEDRICK dissenting.

In North Carolina, the "duty owed to trespassers is that they must not be wilfully or wantonly injured." *Hood v. Queen City Coach Co.*, 249 N.C. 534, 540, 107 S.E. 2d 154, 158 (1959); *Bell v. Page*, 271 N.C. 396, 156 S.E. 2d 711 (1967). The degree of "willfulness" or "wantonness" necessary to impose liability upon a landowner for injury to a trespasser has been defined as follows:

> To constitute willful injury there must be actual knowledge, or that which the law deems to be the equivalent of actual knowledge, of the peril to be apprehended, coupled with a design, purpose, and intent to do wrong and inflict injury. A wanton act is one which is performed intentionally with a reckless indifference to injurious consequences *probable* to

result therefrom. Ordinary negligence has as its basis that a person charged with negligent conduct should have known the probable consequences of his act. Wanton and willful negligence rests on the assumption that he *knew the probable consequences*, but was recklessly, wantonly or intentionally indifferent to the results. (Emphasis added.)

*Wagoner v. North Carolina R. R. Co.*, 238 N.C. 162, 168, 77 S.E. 2d 701, 706 (1953); *Jarvis v. Sanders*, 34 N.C. App. 283, 237 S.E. 2d 865 (1977); *Haddock v. Lassiter*, 8 N.C. App. 243, 174 S.E. 2d 50 (1970).

Since there is plenary evidence that the defendants intentionally stretched the cable across the roadway, I focus on the questions whether there is any evidence to support a finding that the defendants "knew the probable consequences" of their act and whether they were "recklessly, wantonly or intentionally indifferent to the results."

While the defendants testified that they had no actual knowledge that the minor plaintiff had ever ridden his motorbike on their private drive, there is ample evidence in the record tending to show that automobiles, motorcycles, and even horses, were ridden by trespassers on the roadway in question on numerous occasions over a period of many months after the defendants purchased the property, and while the defendants were working on the house located on the property. Although there is evidence in the record that the 3/8 inch aluminum cable was easily visible at a distance of 180 feet, there is also evidence tending to show that the cable blended in with the surroundings and was barely visible even to a person who knew it was there.

This evidence, when considered in the light most favorable to the plaintiff, gives rise to the following inferences: (1) that the defendants knew that trespassers were riding motorcycles or trail bikes over their private driveway; (2) that the 3/8 inch aluminum cable was difficult to see, even if one knew it was there; and (3) that the cable stretched across the driveway at a height of 3½ to 4 feet would be dangerous to persons riding motorcycles or trail bikes. These inferences would permit the jury to find that the defendants knew the probable consequences of their act, and that they were recklessly, wantonly, and

---

Lee v. Tire Co.

---

heedlessly indifferent to the results in creating the condition that proximately caused the minor plaintiff's injuries.

The defendants argue that the trial judge should have granted their motions for a directed verdict and for a judgment notwithstanding the verdict because the minor plaintiff was contributorily negligent as a matter of law. However, the rule in North Carolina is that when willful or wanton conduct for which defendant is responsible is a proximate cause of the injuries complained of, the contributory negligence of the plaintiff will not bar recovery. *Brewer v. Harris*, 279 N.C. 288, 182 S.E. 2d 345 (1971); *Pearce v. Barham*, 271 N.C. 285, 156 S.E. 2d 290 (1967); *Jarvis v. Sanders, supra.* The case of *Pafford v. Jones Construction Co.*, 217 N.C. 730, 9 S.E. 2d 408 (1940), cited by the defendants, is not authority to the contrary.

For the reasons stated above, I vote to affirm.