LINDA JONES v. THE CITY OF DURHAM AND JOSEPH M. KELLY (IN HIS OFFICIAL
CAPACITY AS A POLICE OFFICER FOR THE CITY OF DURHAM)

No. 137A05

(Filed 16 December 2005)

**Police Officers— speeding when responding to call—pedestrian injured**

Plaintiff failed to demonstrate the existence of a genuine issue of material fact as to gross negligence, and defendants were entitled to summary judgment, in an action in which a pedestrian was struck and injured by a police car speeding to a call. The standard of negligence by which a law enforcement officer must be judged when acting within N.C.G.S. § 20-145 is that of gross negligence, which arises where the emergency responder recklessly disregards the safety of others. The three dispositive factors are the circumstances initiating the event, when and where the event occurred, and the conduct or actions of the officer.

Justice MARTIN dissenting.

Justice BRADY dissenting.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 168 N.C. App. 433, 608 S.E.2d 387 (2005), affirming in part and reversing in part an order and judgment entered on 6 January 2004 by Judge A. Leon Stanback, Jr. in Superior Court, Durham County. Heard in the Supreme Court 14 September 2005.

*Glenn, Mills & Fisher, P.A., by Robert B. Glenn, Jr., Stewart W. Fisher, and Carlos E. Mahoney, for plaintiff-appellant.*

*Faison & Gillespie, by Reginald B. Gillespie, Jr., for defendant-appellees.*

LAKE, Chief Justice.

The sole question presented for review in this case is whether plaintiff presented sufficient evidence to show a genuine issue of material fact in order to survive summary judgment under a law enforcement officer vehicular gross negligence standard.

The Court of Appeals reversed the trial court and held that plaintiff's forecast of evidence was insufficient to maintain a claim of

gross negligence. Furthermore, the court held that defendants were entitled to judgment as a matter of law. For the reasons set forth below, we affirm the decision of the Court of Appeals.

The following evidence was before the trial court at the time of its entry of the partial summary judgment order leading to this appeal: On 15 September 2000, at approximately 9:00 a.m., Officer Tracey Fox ("Officer Fox") was dispatched to investigate a domestic disturbance at 800 North Street in Durham. This residence was familiar to officers, because it had previously been the location of a domestic disturbance involving weapons, and this information was relayed to all officers by Dispatch. Soon after arriving at the scene, Officer Fox determined that she would need assistance and called for backup. Upon receiving her call, Dispatch issued a "signal 20" which indicated a dangerous situation requiring that all other officers give way for Officer Fox's complete access to the police radio by holding all calls. Officer Joseph M. Kelly ("Officer Kelly" or "defendants" when referred to collectively with the City of Durham) was approximately two and one-half miles from Officer Fox's location.

In response to the first call by Officer Fox, Officer Kelly and other officers began driving in their separate vehicles towards North Street. Officer Fox then made a second distress call, and stated with a noticeably shaky voice, that she needed more units. Officer Kelly and Officer H.M. Crenshaw independently activated their blue lights and sirens and increased the speed of their vehicles towards North Street.

As Officer Kelly was on his way to assist Officer Fox, Linda Jones ("plaintiff") was leaving her sister's apartment complex at the southwest corner of the intersection of Liberty Street and Elizabeth Street ("the intersection"). Plaintiff walked to a point on Liberty Street approximately ninety-five feet west of the intersection. The posted speed limit there was 35 miles per hour. Additionally, Liberty Street had three undivided lanes: two eastbound lanes with the second or middle eastbound lane designated as a turn only lane, and a westbound lane. At the curb, plaintiff observed no vehicles approaching, but heard sirens approaching from an indeterminable direction. Plaintiff began to cross Liberty Street in the middle of the block outside of any designated crosswalk and against the controlling traffic signal. Having reached the double yellow lines after crossing two-thirds of the roadway, plaintiff first saw a police vehicle heading towards her in the westbound lane. At a speed estimated between 45

and 60 miles per hour, Officer Kelly's vehicle went briefly airborne in crossing a railroad track, and he then observed plaintiff at a distance of approximately 300 to 332 feet. In an attempt to avoid striking plaintiff, Officer Kelly turned his vehicle into the eastbound lanes in order to pass behind plaintiff, who apparently was heading across the westbound lane. However, plaintiff did not continue across the westbound lane. Instead, at that moment, she abruptly turned around and began running back in the direction from which she had come, back across the two eastbound lanes. Officer Kelly's vehicle struck plaintiff on her side as she was retreating to the curb, causing plaintiff severe injuries.

In her initial complaint, plaintiff brought claims against Officer Kelly and the City of Durham for negligence, gross negligence, and obstruction of public justice and spoliation of evidence. Defendants' answer included a motion to dismiss based on N.C.G.S. § 1A-1, Rule 12(b)(6) and pled the affirmative defenses of immunity and contributory negligence. Plaintiff responded alleging the doctrine of last clear chance to defendants' defense of contributory negligence. Plaintiff then filed an amended complaint, bringing additional claims alleging that defendants' assertion of immunity in this case violated a number of plaintiff's rights under the North Carolina Constitution. This matter, with pleadings, exhibits, affidavits, and depositions of forecast evidence, was presented before the trial court in a summary judgment hearing held on 11 December 2003 pursuant to motions brought by both parties.

In an order entered 6 January 2004, the trial court concluded the following: (1) that plaintiff's ordinary negligence claim was dismissed as a matter of law; (2) that there were issues of fact as to whether Officer Kelly was grossly negligent in his emergency response to assist and apprehend the suspect threatening Officer Fox; (3) that there were issues of fact concerning plaintiff's obstruction of public justice and spoliation claim; (4) that plaintiff's claim for violation of the prohibition against exclusive emoluments based on Article I, Section 32 of the North Carolina Constitution was dismissed as a matter of law; and (5) the manner in which defendants have asserted sovereign immunity in this and other cases has been arbitrary and capricious and violates guarantees of due process and equal protection under Article I, Section 19 of the North Carolina Constitution as a matter of law. The trial court certified its order under N.C.G.S. § 1A-1, Rule 54(b) as an entry of final judgment. Both parties appealed to the Court of Appeals.

In their appeal, defendants assigned error to the trial court's finding of an issue of fact supported by forecast evidence as to whether defendants were grossly negligent and argued the trial court should have granted summary judgment as a matter of law in their favor. Additionally, defendants alleged the trial court erred when failing to rule in their favor as a matter of law on the spoliation and constitutional claims. Plaintiff's only issue on appeal to the Court of Appeals submitted that the trial court erred in dismissing her claim of ordinary negligence by finding the standard to be inapplicable as a matter of law in light of the forecast evidence.

Judge Levinson dissented from the majority opinion's reversal of the trial court's denial of defendants' motion for summary judgment on the gross negligence claim. He further dissented from the majority opinion's holding that plaintiff's constitutional claim and her claim for obstruction of justice were moot. He stated that he would affirm the trial court's dismissal of defendants' summary judgment motion on the spoliation claim. However, he would have reversed the trial court's entry of summary judgment for plaintiff on her claim of violation of her rights to due process and equal protection under Article I, Section 19 of the North Carolina Constitution.

Plaintiff filed her appeal of right based on the dissenting opinion in accordance with N.C.G.S. § 7A-30(2). Although plaintiff presented the two issues of gross negligence and obstruction of justice in her notice of appeal, her brief to this Court addressed only the gross negligence issue. Therefore, plaintiff has abandoned her appeal of right as to the obstruction of justice issue, and that assignment of error is dismissed. *See* N.C. R. App. P. 28(b)(6).

The grant of summary judgment for the moving party is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2003); *see Parish v. Hill*, 350 N.C. 231, 236, 513 S.E.2d 547, 550 (1999). In assessing whether the moving party established the absence of any genuine issue of material fact, the evidence presented should be viewed in the light most favorable to the nonmoving party. N.C.G.S. § 1A-1, Rule 56(c). If there is any evidence of a genuine issue of material fact, a motion for summary judgment should be denied. *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 471, 597 S.E.2d 674, 694 (2004).

**JONES v. CITY OF DURHAM**

[360 N.C. 81 (2005)]

In determining whether a genuine issue of material fact exists in the case at bar, the crux of the allegations of gross negligence on the part of Officer Kelly relate to the speed of his vehicle and his maneuver to avoid hitting plaintiff. As properly stated in the majority opinion of the Court of Appeals, Officer Kelly's conduct in the case *sub judice* is governed by N.C.G.S. § 20-145. *Jones v. City of Durham*, 168 N.C. App. 433, 437-39, 608 S.E.2d 387, 390-92 (2005). N.C.G.S. § 20-145 provides the following:

> The speed limitations set forth in this Article shall not apply to vehicles when operated with due regard for safety under the direction of the police in the chase or apprehension of violators of the law or of persons charged with or suspected of any such violation, nor to fire department or fire patrol vehicles when traveling in response to a fire alarm, nor to public or private ambulances and rescue squad emergency service vehicles when traveling in emergencies, nor to vehicles operated by county fire marshals and civil preparedness coordinators when traveling in the performances of their duties. This exemption shall not, however, protect the driver of any such vehicle from the consequence of a reckless disregard of the safety of others.

N.C.G.S. § 20-145 (2003).

In enacting this statutory exemption to our motor vehicle speed limits, it was clearly the intent of the legislature to extend speed limit exemptions beyond mere police pursuits, to include all emergency service vehicles, including police and even "civil preparedness coordinators," "when traveling in emergencies . . . in the performances of their duties." *Id.* This Court has held that the standard of negligence by which a law enforcement officer must be judged when acting within N.C.G.S. § 20-145 is that of "gross negligence" as to the speed and operation of his vehicle. *Young v. Woodall*, 343 N.C. 459, 462, 471 S.E.2d 357, 359 (1996). *See also State v. Flaherty*, 55 N.C. App. 14, 22, 284 S.E.2d 565, 571 (1981) (focusing on defendant officer's emergency response and stating that N.C.G.S. § 20-145 applies not only to direct or immediate pursuits but also to police who receive notice of and proceed to the scene to assist in the chase or apprehension; in so doing the court required the gross negligence standard to be applied).

The statute itself states the exemption shall not apply to a driver who operates a covered vehicle in "reckless disregard of the safety of others," the definition of gross negligence. N.C.G.S. § 20-145. The quoted language is consistent with the definition of gross negligence

used by this Court. *See Bullins v. Schmidt*, 322 N.C. 580, 583, 369 S.E.2d 601, 603 (1998) (defining gross negligence as "wanton conduct done with conscious or reckless disregard for the rights and safety of others"). However, we note that N.C.G.S. § 1D-5(7) defines "willful and wanton conduct" and establishes that such conduct, necessary for the recovery of punitive damages, *see* N.C.G.S. § 1D-15(a), is more than gross negligence. In light of this distinction, we conclude that while willful and wanton conduct includes gross negligence, gross negligence may be found even where a party's conduct does not rise to the level of deliberate or conscious action implied in the combined terms of "willful and wanton." *See Foster v. Hyman*, 197 N.C. 189, 191, 148 S.E.2d 36, 37-38 (1929).

Accordingly, while our previous decisions have conflated actions done with wicked purpose with actions done while manifesting a reckless indifference to the rights and safety of others under the rubric of "gross negligence," we conclude that the General Assembly intended to distinguish these two types of action. Reading N.C.G.S. § 20-145 and N.C.G.S. § 1B-5 together, we conclude that in the context of a response to an emergency by a law enforcement officer or other individuals named in N.C.G.S. § 20-145, gross negligence arises where the responder recklessly disregards the safety of others.

In determining whether a law enforcement officer's actions rise to the level of gross negligence, pursuant to N.C.G.S. § 20-145, our appellate courts have considered a number of factors to ascertain whether the forecast of the evidence supporting the claim was sufficient to survive a motion for summary judgment. *See, e.g., Bray v. N.C. Dep't of Crime Control & Pub. Safety*, 151 N.C. App. 281, 564 S.E.2d 910 (2002). The three factors this Court considers to be dispositive on the issue of a law enforcement officer's gross negligence are: (1) the circumstances initiating the event or the reason why the officer became involved in an event of increased speed; (2) when and where the event of increased speed occurred; and (3) what specific conduct or actions the officer undertook during the course of the event of increased speed. Applying these factors to plaintiff's forecast of evidence and viewing such in the light most favorable to plaintiff, we conclude that plaintiff did not demonstrate the existence of a genuine issue of material fact as to gross negligence on the part of Officer Kelly, and judgment as a matter of law should have been entered by the trial court denying plaintiff's gross negligence claim against defendants.

Considering first the circumstances which prompted defendant Kelly to become involved, the evidence before the trial court clearly reflected an emergency situation in which the life or the safety of another law enforcement officer was at stake. Officer Kelly was involved in an event of increased speed in response to Officer Fox's two distress calls for assistance. The residence at which Officer Fox was requesting backup was familiar to the officers as the location of a past domestic disturbance involving weapons. Furthermore, Dispatch's declaration of a "signal 20" indicated that a fellow officer was in a dangerous situation. Finally, during Officer Fox's second call, with her voice noticeably shaky and a considerable amount of commotion audible in the background, she made a request to "send more units!" These circumstances reflected an emergency situation all too common in police work when another officer is in peril. Law enforcement officers are trained to respond to such an emergency and Officer Kelly's justifiably urgent response was in accordance with that training. As such, Officer Kelly's response refutes any indication that he was acting with conscious or reckless disregard for the rights or safety of others in becoming involved in an event calling for increased speed in order to reach the location of his fellow officer in distress.

This Court has previously held a law enforcement officer was not grossly negligent for pursuing a suspect who violated a mere safety infraction. *Young*, 343 N.C. at 460, 463, 471 S.E.2d at 358, 360 (holding no gross negligence when a law enforcement officer drove in the nighttime "at a high rate of speed" to pursue a vehicle with only one operating headlight). Certainly if the pursuit of a vehicle with only one operating headlight is sufficient reason for an officer to become engaged in an event of increased speed without a holding of gross negligence, then Officer Kelly's response to Officer Fox's two distress calls in a possible life or death situation was a justifiable event of increased speed.

Turning now to the evidence with respect to when and where defendant officer undertook the event of increased speed, the record reflects that Officer Kelly drove his vehicle at a speed of 45 to 60 miles per hour on a cool, clear, and dry morning, with his siren activated, for a distance of two and one-half miles in light traffic through a residential area. These circumstances surrounding the timing and location of Officer Kelly's event of increased speed were considerably less dangerous to others than those found in cases from this Court and the Court of Appeals in which gross negligence was held

not to be present. *See Parish*, 350 N.C. at 233-34, 246, 513 S.E.2d at 548-49, 556 (holding no gross negligence when law enforcement officer was involved in an event of increased speed for approximately six miles shortly after 2:00 a.m.); *Young*, 343 N.C. at 460, 463, 471 S.E.2d at 358, 360 (holding no gross negligence when law enforcement officer was involved in an event of increased speed at approximately 2:00 a.m. without activating his blue lights and siren); *Bullins*, 322 N.C. at 581, 584, 369 S.E.2d at 602, 604 (holding no gross negligence when law enforcement officer was involved in an event of increased speed for eighteen miles shortly after 1:00 a.m.); *Bray*, 151 N.C. App. at 282, 285, 564 S.E.2d at 911, 913 (holding no gross negligence when law enforcement officer was involved in an event of increased speed at dusk); *Norris v. Zambito*, 135 N.C. App. 288, 290, 295, 520 S.E.2d 113, 115, 117-18 (1999) (holding no gross negligence when law enforcement officer was involved in an event of increased speed at approximately 1:00 a.m.); *Clark v. Burke Cty.*, 117 N.C. App. 85, 90, 92, 450 S.E.2d 747, 749-50 (1994) (holding no gross negligence when a law enforcement officer was involved in an event of increased speed just after 4:00 a.m. within city limits); and *Fowler v. N.C. Dep't of Crime Control & Pub. Safety*, 92 N.C. App. 733, 733-34, 736, 376 S.E.2d 11, 12-13 (holding no gross negligence when a law enforcement officer was involved in an event of increased speed for over eight miles shortly before midnight and delayed activating his blue lights and siren), *disc. rev. denied*, 324 N.C. 577, 381 S.E.2d 773 (1989). Thus, when comparing the case at bar with the appellate decisions of this state, it is evident that both this Court and the Court of Appeals have found circumstances regarding the timing and location of an event of increased speed which presented substantially greater potential for danger to fall short of constituting gross negligence.

Finally, we consider defendant officer's specific conduct during the event of increased speed. When viewed in the light most favorable to plaintiff, Officer Kelly was traveling at a speed of 45 to 60 miles per hour between the railroad tracks and the point of impact, where the posted speed limit was 35 miles per hour; his vehicle became airborne when crossing the railroad tracks immediately preceding the intersection; and he performed an evasive maneuver rather then applying the brakes upon seeing plaintiff on the double yellow lines. This conduct on the part of the officer boils down to only two actions: his driving speed and the evasive maneuver. The fact that his vehicle went briefly airborne as he went over the railroad tracks is relevant only in the context of his high rate of speed, which is

acknowledged. This event occurred 300 to 332 feet prior to impact and has no separate relevance.

With regard to driving speed, Officer Kelly was traveling 10 to 25 miles per hour in excess of the 35 mile-per-hour speed limit. Traveling 10 to 25 miles per hour over the speed limit by a law enforcement officer in an emergency situation is not conduct which supports a finding of gross negligence. This Court and the Court of Appeals have examined exceeding the posted speed limit in the context of law enforcement officer gross negligence on numerous occasions and have found speed differentials similar to and far greater than that of Officer Kelly not supportive of gross negligence. *See Parish*, 350 N.C. at 234, 246, 513 S.E.2d at 549, 556 (holding no gross negligence when officer was traveling at speeds up to 130 miles per hour); *Bullins*, 322 N.C. at 582, 584, 369 S.E.2d at 602, 604 (holding no gross negligence when officer was traveling at speeds up to 100 miles per hour); *Bray*, 151 N.C. App. at 283-84, 564 S.E.2d at 911-13 (holding no gross negligence when officer was traveling 80 miles per hour on a curving rural road in a 55 mile-per-hour zone, 25 miles-per-hour differential); *Norris*, 135 N.C. App. at 291, 295, 520 S.E.2d at 115, 117-18 (holding no gross negligence when officer was traveling 65 miles per hour in a 35 mile-per-hour zone, 30 miles-per-hour differential); *Clark*, 117 N.C. App. at 90-92, 450 S.E.2d at 749-50 (holding no gross negligence when officer was traveling 70 to 80 miles per hour in a 45 mile-per-hour zone, 25 to 35 miles-per-hour differential); *Fowler*, 92 N.C. App. at 736, 376 S.E.2d at 13 (holding no gross negligence when officer was traveling at approximately 115 miles per hour). Therefore, in light of the considerable precedent of this Court and the Court of Appeals, plaintiff's contention that Officer Kelly's conduct, in exceeding the posted speed limit by 10 to 25 miles per hour, constitutes gross negligence must fail.

As to the evasive maneuver, plaintiff has forecast no evidence of "conduct done with conscious or reckless disregard for the rights and safety of others" regarding Officer Kelly's decision to perform such a maneuver, rather than attempting to stop, upon seeing plaintiff on the double yellow line two-thirds of the way across Liberty Street. Defendants' forecast of evidence showed that Officer Kelly steered his vehicle into the eastbound lanes of traffic where there was a larger area to avoid hitting plaintiff, in anticipation that she would attempt to get out of the street by continuing forward, which was the shortest distance possible. Furthermore, defendants' forecast of evidence showed that this evasive maneuver was consistent with the

*Basic Law Enforcement Training Manual* published by the North Carolina Justice Academy. The manual provides that one method to avoid a collision is by "[e]vasive steering or sudden lane change." This method is "[u]sually performed when the driver's intended path-of-travel is suddenly blocked by an object, pedestrian, or other vehicle." N.C. Justice Acad., *Basic Law Enforcement Training: Student* § 18F, at 48 (Jan. 2006). The North Carolina Administrative Code specifies that the manual is to be used as the curriculum for the basic training course for law enforcement officers as administered by the North Carolina Criminal Justice Education and Training Standards Commission. 12 NCAC 9B .0205(c) (June 2004). By statute, the North Carolina Criminal Justice Education and Training Standards Commission has the power to establish educational and training standards that must be met in order to qualify and be certified or recertified as a sworn law enforcement officer. N.C.G.S. §§ 17C-2(3), -6(a)(2), -6(a)(3) (2003). Officer Kelly's compliance with this authoritative training standard in this emergency situation fully supports the appropriateness of his decision to perform an evasive maneuver upon viewing plaintiff in the roadway and negates the contention of gross negligence.

In summary, we conclude that plaintiff's forecast of evidence, and all evidence available to the trial court, of Officer Kelly's reason for becoming involved, the circumstances surrounding the timing and location, and the conduct he undertook during the event of increased speed reveal the total absence of any material fact reflecting gross negligence. During a justifiable event of increased speed, Officer Kelly made a substantial and reasonable effort to avoid a collision with plaintiff, but was unsuccessful due largely to plaintiff's sudden change in direction. Thus, the Court of Appeals correctly held that plaintiff failed to demonstrate the existence of a genuine issue of material fact as to gross negligence and that defendants were entitled to summary judgment as a matter of law. Any other conclusion would have betrayed this Court's admonition against blurring the clear distinction between gross negligence and ordinary negligence established by the mature body of case law recognized in *Yancey v. Lea*, 354 N.C. 48, 57, 550 S.E.2d 155, 160 (2001). The majority opinion of the Court of Appeals is affirmed.

AFFIRMED.

**JONES v. CITY OF DURHAM**

[360 N.C. 81 (2005)]

Justice MARTIN dissenting.

"[N]o person shall be deprived of a trial on a genuine disputed factual issue." *Kessing v. Nat'l Mortgage Corp.*, 278 N.C. 523, 534, 180 S.E.2d 823, 830 (1971). Summary judgment in a negligence case is rarely appropriate under North Carolina jurisprudence. *Moore v. Crumpton*, 306 N.C. 618, 624, 295 S.E.2d 436, 440 (1982). As Justice (later Chief Justice) Mitchell stated for this Court in *Moore*: "Even where there is no dispute as to the essential facts, where reasonable people could differ with respect to whether a party acted with reasonable care, it ordinarily remains the province of the jury to apply the *reasonable person standard*." *Id.* at 624, 295 S.E.2d at 441 (emphasis added). More recently, we observed that "[s]ummary judgment is inappropriate where reasonable minds might easily differ as to the import of the evidence." *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 221-22, 513 S.E.2d 320, 326 (1999) (citing *Dettor v. BHI Prop. Co. No. 101*, 324 N.C. 518, 522, 379 S.E.2d 851, 853 (1989)). In ruling on a motion for summary judgment, the trial court must construe the evidence in the light most favorable to the nonmoving party. *Speck v. N.C. Dairy Found., Inc.*, 311 N.C. 679, 680, 319 S.E.2d 139, 140 (1984) (citing *Flippin v. Jarrell*, 301 N.C. 108, 270 S.E.2d 482 (1980)).

In the instant case, defendants had the burden of establishing the lack of a genuine issue of material fact on the issue of gross negligence. *See Moore*, 306 N.C. at 624, 295 S.E.2d at 441 (citing *Oestreicher v. Am. Nat'l Stores, Inc.*, 290 N.C. 118, 225 S.E.2d 797 (1976)). Because defendants failed to meet their burden, the trial court properly denied summary judgment.

The gross negligence standard is nebulous and courts have struggled to define it. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 34, at 212 (5th ed. 1984) [hereinafter *Prosser*]; *see, e.g., Supervisor of Pickens Cty., S.C. v. Jennings*, 181 N.C. 393, 400-01, 107 S.E. 312, 315-16 (1921) (discussing the difficulty of defining gross negligence and suggesting that it is indistinguishable from ordinary negligence). We have defined gross negligence as "wanton conduct done with conscious or reckless disregard for the rights and safety of others." *Bullins v. Schmidt*, 322 N.C. 580, 583, 369 S.E.2d 601, 603 (1988) (citing *Hinson v. Dawson*, 244 N.C. 23, 92 S.E.2d 393 (1956); *Wagoner v. N.C. R.R. Co.*, 238 N.C. 162, 77 S.E.2d 701 (1953); *Jarvis v. Sanders*, 34 N.C. App. 283, 237 S.E.2d 865 (1977)). Gross negligence, as a distinct right of action, falls somewhere on the "continuum of culpability" between ordinary negligence and recklessness.

JONES v. CITY OF DURHAM

[360 N.C. 81 (2005)]

*See Prosser* § 34, at 211-12 (noting that gross negligence was originally conceptualized as "the want of even slight or scant care"). Gross negligence does not require *more* egregious behavior than recklessness; it is, after all, gross *negligence*. The question is whether the defendant's actions were " 'done needlessly, manifesting a *reckless indifference* to the rights of others.' " *Parish v. Hill*, 350 N.C. 231, 239, 513 S.E.2d 547, 551-52 (1999) (quoting *Foster v. Hyman*, 197 N.C. 189, 191, 148 S.E. 36, 38 (1929)), *quoted in Wagoner*, 238 N.C. at 167, 77 S.E.2d at 705 (emphasis added). An officer must balance the legitimate interests of law enforcement "with the interests of the public in not being subjected to unreasonable risks of injury." *Parish*, 350 N.C. at 236, 513 S.E.2d at 550.

Plaintiff, Linda Jones, submitted the following forecast of evidence: Defendant Kelly was traveling westbound on Liberty Street in response to a distress call from a fellow officer. He was not aware of the exact nature of the situation. He proceeded to drive his vehicle through a residential neighborhood at speeds up to 74 miles per hour, even though the posted speed limit was only 35 miles per hour.[1] He did so without properly using his emergency lights or siren. He admitted he steered his vehicle with one hand. He traveled through an intersection he knew to be dangerous. Specifically, he knew this intersection was the site of previous accidents and significant pedestrian activity. He also knew his view of the intersection would be obstructed and "it would not be feasible" to travel faster than 45 miles per hour. Despite this knowledge, he drove his vehicle into the intersection without significantly lessening his rate of speed. His vehicle went airborne, landing in the wrong lane of travel approximately 300 to 332 feet from the point of pedestrian impact.

Linda Jones saw the police vehicle traveling airborne over the railroad tracks as she was attempting to cross Liberty Street. She immediately turned around and began running back towards the curb.[2] Even though defendant saw Jones in his direct path, he did not apply his brakes. Rather, he accelerated his vehicle through the wrong lane of travel. At the point of impact, the police vehicle was

1. In so doing, defendant violated Durham Police Department procedures by exceeding the speed limit when he knew that at least four other officers were already responding to the request for backup.

2. The majority critiques plaintiff's reaction to an airborne police vehicle bearing down on her. It suffices to say, however, that plaintiff's conduct is only relevant to the question of whether she breached her own duty of care, i.e., was contributorily negligent. Contributory negligence, however, is not a defense to a gross negligence claim. David A. Logan & Wayne A. Logan, *North Carolina Torts* § 9.20, at 209 (1996).

traveling up to 60 miles per hour, striking Jones with such force that she was thrown 76 feet (a distance exceeding one-fourth the length of a football field). According to Jones, she "tried hard to get out of his way," expecting him to "stay on his side [of the road]," but "as he came down out of the air, he lost control of his car" and struck her "just before [she] had stepped up on the curb." Linda Jones landed in the gutter along the eastbound lane of Liberty Street, sustaining severe injuries.

In my view, the majority does not construe the evidence in the light most favorable to the nonmoving party, thereby depriving plaintiff Linda Jones "of a trial on a genuine disputed factual issue." *Kessing*, 278 N.C. at 534, 180 S.E.2d at 830. First, the majority's characterization of defendant's top speed as 45 to 60 miles per hour is inconsistent with the deposition testimony of Michael Sutton, an accident reconstruction expert, who testified that defendant's vehicle traveled 73 to 74 miles per hour along Liberty Street. Second, the majority claims that defendant's alleged evasive maneuver complied with basic law enforcement procedures. Plaintiff's forecast of evidence, however, includes the affidavit of Norman S. Beck, a twenty year veteran of the Durham Police Department and certified law enforcement instructor, who stated that "Officer Kelly's actions after observing the Plaintiff in the roadway were . . . inconsistent with the standards and training applicable to police officers employed by the City of Durham." Third, a reasonable juror could easily find that defendant was not aware of the circumstances of the distress call. When asked during his deposition whether either of two distress calls indicated why backup was needed, he answered "no."[3] These stark discrepancies within the instant forecast of evidence, as reflected in the majority and dissenting opinions in this Court, clearly illustrate the folly of determining the gross negligence issue as a matter of law.

The forecast of evidence in the instant case included affidavits, depositions, exhibits, pleadings, and video footage of the incident. We must construe this forecast of evidence, including video footage showing police vehicles traveling through a residential neighborhood at high speeds, in the light most favorable to plaintiff. This forecast of evidence would permit, but not require, a reasonable juror to find

---

3. The record indicates that emergency response situations are a routine occurrence. Officer Long testified at deposition that he personally found himself in an emergency response situation "two or three times a day." He also stated that he had never traveled faster than 45 miles per hour on the relevant segment of Liberty Street while responding to an emergency.

that defendant's conduct exposed the public to an unreasonable risk of injury.

The decisions of this Court accord considerable deference to the difficult judgments made by law enforcement officers under exigent circumstances. However, under the facts and circumstances of the present case, plaintiff's forecast of evidence creates a genuine issue of material fact as to whether defendant's actions were grossly negligent. A jury, not this Court, should decide the gross negligence issue.[4]

I respectfully dissent.

Justice BRADY dissenting.

If Officer Kelly's actions do not rise to gross negligence, then what does? Further, the majority's decision today denies an individual who was severely injured by law enforcement's willful and wanton disregard for the safety of others a forum for her claim.[5] Factually, this seems to me not a complex case; however, the majority misconstrues the basic factual circumstances giving rise to this case and compounds this error by misapplying the law. When all is said and done, the majority holds a law enforcement officer, operating a vehicle at speeds as high as seventy-four miles per hour on a city street in a densely populated urban area with a posted thirty-five mile per hour speed limit, was not grossly negligent. I cannot accept the majority's application of gross negligence to the present situation. Specifically, I dissent for two principal reasons: I. The statute, and thus the gross negligence standard of care created under the statute,

---

4. Plaintiff asserts her gross negligence claim against the individual defendant in his official capacity. Thus, to the extent plaintiff recovers money damages not otherwise barred by the affirmative defense of governmental immunity, only the municipal defendant would be liable therefor. See Meyer v. Walls, 347 N.C. 97, 110, 489 S.E.2d 880, 887 (1997) (stating that "a suit against a defendant in his official capacity means that the plaintiff seeks recovery from the entity of which the public servant defendant is an agent").

5. The majority correctly notes this Court rarely, if ever, finds a law enforcement officer's actions to be grossly negligent in the context of law enforcement vehicular collisions. However, "[a]s many as 40 percent of all motor vehicle police pursuits end in collisions and some of these result in nearly 300 deaths each year of police officers, offenders, or innocent third party individuals." Chris Pipes & Dominick Pape, Police Pursuits and Civil Liability, 70 FBI Law Enforcement Bull., July 2001, at 16, 16 (footnotes omitted). The majority, in continuing to uphold this Court's misapplied approach towards gross negligence with regards to law enforcement, deprives the citizens of this state a forum for redress of their civil damages in a frighteningly large number of fatalities resulting from police pursuits.

which the majority applies to the present case is not applicable because the statute covers only pursuit-related law enforcement activity and not response-related law enforcement activity; and II. Were the statute and the gross negligence standard of care applicable, Officer Kelly's actions rise to the level of gross negligence, if not recklessness, and thus the question of gross negligence should have been submitted to a jury. Accordingly, I respectfully dissent.

## I. Pursuit versus Response Activities

In my view, the majority's analysis has no colorable basis and, likewise, fails to comport with basic tenets of statutory interpretation. The General Assembly, in enacting N.C.G.S. § 20-145, set out those governmental officers and the specific activities to which speed limitations shall *not* apply: (1) during law enforcement officers' "chase or apprehension" of law violators, both actual and suspected; and (2) when a fire department or fire patrol "travel[s] in *response* to a fire alarm" are codified examples. N.C.G.S. § 20-145 (2003) (emphasis added). Clearly, if the legislature intended law enforcement officers' routine *response* activities, as in the instant case, to be insulated under N.C.G.S. § 20-145, they would not have limited the statute's scope solely to "chase or apprehension" in the pursuit of suspects. The legal maxim, "Expressio unius est exclusio alterius"— the expression of one thing implies the exclusion of the other—compels this construction of the statute. *Black's Law Dictionary* 602 (7th ed. 1999).

The General Assembly did address *response* situations in the statute, but they did so only with regards to fire departments, which by their very function and responsibility respond to calls for fire services. The majority's construction of the statutory language—"when traveling in emergencies . . . in the performances of their duties"— hangs off the precipice of reason in that the quoted language is contained in a clause associated with "public or private ambulances and rescue squad emergency service vehicles," not law enforcement vehicles. The majority's rewriting of our statute directly contradicts the original legislative intent and organization of the statutory language. Further, the North Carolina Court of Appeals case cited by the majority as support for holding N.C.G.S. § 20-145 applies to law enforcement officers acting in emergency response situations, *State v. Flaherty*, 55 N.C. App. 14, 284 S.E.2d 565 (1981), concerns an officer's liability while engaged in a *pursuit* activity, and is inapplicable to this Court's analysis with regards to emergency response situations.

JONES v. CITY OF DURHAM

[360 N.C. 81 (2005)]

Each time this Court has applied the provisions of N.C.G.S. § 20-145, the law enforcement conduct in question consisted of actual pursuit of a fleeing, known suspect or violator and not a response activity. *See Parish v. Hill*, 350 N.C. 231, 513 S.E.2d 547 (1999); *Young v. Woodall*, 343 N.C. 459, 471 S.E.2d 357 (1996); *Bullins v. Schmidt*, 322 N.C. 580, 369 S.E.2d 601 (1988); *Goddard v. Williams*, 251 N.C. 128, 110 S.E.2d 820 (1959), *overruled by Young v. Woodall*, 343 N.C. 459, 471 S.E.2d 357 (1996). Thus, the majority's reliance on the pursuit scenario is flawed and the instant case is clearly distinguishable on its facts. Officer Kelly was not chasing or attempting to apprehend a suspect; instead, he, along with eight other officers, was independently *responding* to another officer's call for backup. Sergeant Willy Long, Officer Kelly's supervisor on 15 September 2000, admitted during deposition Officer Kelly was *not* engaged in a pursuit activity, but was engaged in a response activity. Officer Kelly had absolutely no information regarding the factual circumstances facing Officer Fox, nor was he aware of the nature or circumstances of the call to which Officer Fox had initially responded. In reality, Officer Kelly was blindly responding to a routine call for backup. He was not cognizant of any suspects, the presence of danger or a volatile situation, or any information to make a knowing, intelligent decision about the urgency of the response needed. To Officer Kelly, or any other responding officer that morning, Officer Fox's call was simply a precautionary, prudent call for backup. Without clarification or specific information, Officer Kelly's actions cannot be construed as a pursuit, nor was he engaged in the apprehension of a suspect; there was not even a substantiated emergency presented. The majority's reliance on such clearly distinguishable precedent is unwarranted.

The difference between "pursuit" and "response" is not merely a legal distinction, but is well-rooted in the law enforcement community and is set out in law enforcement policy and procedure guidelines. The City of Durham Police Department's General Orders, which mandate its officers' conduct by establishing non-discretionary policies and procedures, set out different criteria for response priorities, vehicle pursuits, and emergency vehicle operation. Durham Police Dep't, Gen. Orders 4001 (Dec. 15, 1995), 4019 R-2 (Nov. 1, 1998), 4051 (Dec. 15, 1995). The General Orders allow vehicular pursuits "only when the necessity of immediate apprehension outweighs the degree of danger created by the pursuit[,]" and also list an extensive number of factors to consider when participating in a pursuit, thereby limiting an individual officer's discretion. *Id.* 4019 R-2, at 1, 4-5, 7-9.

However, when an officer merely responds to a call for assistance, the Police Department's primary stated concern is for its officers "to arrive safely on the scene of the call; the second objective is to arrive as soon as possible." *Id.* 4051, at 1. The list of factors for consideration during an emergency situation is not nearly as extensive as the factors listed regarding pursuit activities. *Id.* at 2-3; *compare id. with* Durham Police Dep't, Gen. Order 4019 R-2, at 4-5, 7-9. It is abundantly clear that the Durham Police Department, as well as the General Assembly, distinguishes law enforcement pursuit from routine response activities. The majority's opinion fails to recognize this well established distinction in the law enforcement community.

As an example, the North Carolina State Highway Patrol distinguishes "Chase Procedures" from "Emergency Response." N.C. State Highway Patrol, *Pol'y Manual*, Directive B.2 §§ IV., VI. (Sept. 27, 2002) [hereinafter Highway Patrol]. The Highway Patrol defines "chase" as "[a]n active attempt by one or more officers in authorized Patrol vehicles to apprehend a suspect or violator of the law operating a motor vehicle, while that person is attempting to avoid capture by using high-speed driving or other tactics." *Id.* § II., at 2. In contrast, the Highway Patrol defines "emergency response" as "[t]he act of one or more officers operating authorized Patrol vehicles for the purpose of responding to a situation requiring immediate Police [action] due to a clear and present danger to public or officer safety, a need for immediate apprehension of a violator, or a serious crime in progress." *Id.* at 2-3. Life-threatening situations should be treated as a "high priority that justifies an emergency response[,]" Highway Patrol § III.A.3.a., while pursuits of a continuing moving violator "present a substantial continuing hazard to the public [and] are of a *higher* priority[,]" *id.* § III.A.1.c. (emphasis added). Further, the North Carolina Justice Academy's Basic Law Enforcement Training Manual (Student), cited by the majority and required to be used in all BLET courses in the State of North Carolina as mandated by the North Carolina Administrative Code, 12 NCAC 9B .0205(c) (June 2004), also distinguishes between "emergency response considerations" and "pursuit driving considerations." N.C. Justice Acad., *Basic Law Enforcement Training: Student* § 18F, at 49, 59 (Jan. 2006).

This distinction is not limited to North Carolina; rather, it is a nationwide doctrine in the law enforcement community. The International Association of Chiefs of Police recognizes this distinction between "vehicular pursuit" and "response." Int'l Ass'n of Chiefs of Police, *Manual of Police Traffic Services Policies and*

*Procedures* §§ 1.1· (June 1, 2004), 1.27 (July 1, 2004), *available at* http://www.theiacp.org/div_sec_com/committees/Highway_Safety.htm [hereinafter IACP]. The IACP defines "vehicular pursuit" as "[a]n active attempt by an officer in an authorized emergency vehicle to apprehend a fleeing suspect who actively is attempting to elude the police." *Id.* § 1.1, III.A. The IACP generally defines a response situation as "any call for service." *Id.* § 1.27, III. In the instant case, what the majority fails to acknowledge is the fact that Officer Kelly was engaged in simply a response situation and nothing more.

The plain language of N.C.G.S. § 20-145 addresses law enforcement personnel engaged in the "chase or apprehension" of law violators or suspects. The majority's attempt to force square pegs into round holes is incorrect, and its construction of this statute to cover both law enforcement officers' "chase or apprehension" of law violators *and* their response activities is simply judicial activism. The proper role of the Court is to interpret the law, rather than to legislate. Unlike the majority, I cannot in good conscience apply pursuit and apprehension law to a simple, routine response situation.

## II. The Gross Negligence Standard

As the above analysis reflects, Officer Kelly's actions are not governed by N.C.G.S. § 20-145; his conduct in the instant case should instead be evaluated under an ordinary negligence standard. That is, Officer Kelly's negligence in this simple response activity is evidenced by his "omission of the duty to exercise due care." *Hanes v. Shapiro & Smith*, 168 N.C. 81, 87, 168 N.C. 24, 30, 84 S.E. 33, 36 (1915). However, if the instant case were a pursuit situation, N.C.G.S. § 20-145 is clear and unambiguous in its terms. The statute does not protect law enforcement officers acting in the "chase or apprehension" of law violators from "the consequence of a reckless disregard of the safety of others." N.C.G.S. § 20-145.[6] This Court has clearly interpreted N.C.G.S. § 20-145 as establishing a standard of care for law enforcement officers, rather than an exemption from the statute. *Parish v. Hill*, 350 N.C. at 238, 513 S.E.2d at 551.

Contrary to this Court's well-reasoned earlier precedent, the decision in *Young v. Woodall* violated the basic tenet of *stare decisis* in

---

6. The Highway Patrol requires its troopers to exercise "due regard for the safety of others" in both response and pursuit or chase situations. Highway Patrol §§ IV.A., VI.A. The IACP prohibits officers from driving in a "reckless manner or without due regard for the safety of others" in high priority response situations, IACP § 1.27, IV.B.; in pursuit situations, officers may not "drive with reckless disregard for the safety of themselves or of other road users," *id.* § 1.1, IV.B.4.

departing from the well-established, applicable, ordinary negligence standard of care when it adopted a higher gross negligence standard regarding N.C.G.S. § 20-145. 343 N.C. at 462, 471 S.E.2d at 359 ("It seems clear to us that the standard of care intended by the General Assembly involves the reckless disregard of the safety of others, which is gross negligence.").[7] Most telling of this Court's disregard for the principle of *stare decisis* in *Young* was the authoring justice's acknowledgment that the application of the earlier precedent by the Court of Appeals was "certainly reasonable." *Id.* Further, this abrupt departure lacked any comprehensive analysis or reason; nevertheless, gross negligence is now the applicable standard under N.C.G.S. § 20-145, though I would submit this interpretation is contrary to public policy.

Correspondingly, our analysis thus turns upon the seamless web of the facts of the case *sub judice* and the *corpus juris* of gross negligence. While the majority confidently states the definition of gross negligence is "reckless disregard of the safety of others," as stated in N.C.G.S. § 20-145, a survey of this Court's precedent, of various jurisdictions in the United States, and of persuasive scholarly analysis reveals the enigmatic nature of gross negligence. The difficulty in defining gross negligence is that it is "a term so nebulous" with "no generally accepted meaning." W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 34, at 212 (5th ed. 1984). The Supreme Court of South Carolina most recently defined gross negligence as

[T]he "intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally

---

7. Originally, this Court applied an ordinary negligence standard to tortious actions committed by law enforcement officers acting under N.C.G.S. § 20-145. *See Goddard v. Williams*, 251 N.C. at 133-34, 110 S.E.2d at 824-25 (" 'We know of no better standard by which to determine a claim of negligence on the part of a police officer than by comparing his conduct * * * to the care which a reasonably prudent man would exercise in the discharge of official duties of like nature under like circumstances.' ") (citation omitted). This Court then modified its approach to N.C.G.S. § 20-145 in *Bullins v. Schmidt*, 322 N.C. 580, 369 S.E.2d 601, by holding the ordinary negligence standard of care established in *Goddard* should only apply to a law enforcement officer's actions under N.C.G.S. § 20-145 when the officer's vehicle actually collides with another person, vehicle, or object. *Id.* at 582, 369 S.E.2d at 603. When the officer's vehicle did not collide with another person, vehicle, or object, the applicable standard under N.C.G.S. § 20-145 was gross negligence. *Id.* at 583, 369 S.E.2d at 603. This Court abandoned the above precedent in *Young v. Woodall* by holding gross negligence to be the applicable standard of care for all incidents occurring under N.C.G.S. § 20-145. 343 N.C. at 462, 471 S.E.2d at 359. Other jurisdictions continue to apply an ordinary negligence standard to their versions of N.C.G.S. § 20-145. *See Tetro v. Town of Stratford*, 189 Conn. 601, 609-10, 458 A.2d 5, 9-10 (1983); *Haynes v. Hamilton Cty.*, 883 S.W.2d 606, 609-10 (Tenn. 1994); *Travis v. City of Mesquite*, 830 S.W.2d 94, 98-99 (Tex. 1992).

that one ought not to do." Gross negligence is also the "failure to exercise slight care" and is "a relative term and means the absence of care that is necessary under the circumstances[,]" which reflects the elusive nature of a workable gross negligence definition. *Clark v. S.C. Dep't of Pub. Safety*, 362 S.C. 377, 383, 608 S.E.2d 573, 576-77 (2005) (holding the question of whether a law enforcement officer's pursuit activities constituted gross negligence was for the jury) (citations omitted).

Our Court has defined gross negligence as " 'wanton conduct done with conscious or reckless disregard for the rights and safety of others.' " *Yancey v. Lea*, 354 N.C. 48, 52, 550 S.E.2d 155, 157 (2001) (quoting *Bullins*, 322 N.C. at 583, 369 S.E.2d at 603); *Parish*, 350 N.C. at 239, 513 S.E.2d at 551. In defining willful and wanton conduct, this Court stated:

> An act is done wilfully when it is done purposely and deliberately in violation of law, or when it is done knowingly and of set purpose, or when the mere will has free play, without yielding to reason. . . .

> An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others.

*Foster v. Hyman*, 197 N.C. 189, 191, 148 S.E. 36, 37-38 (1929) (citations omitted). We note "this Court has often used the terms 'willful and wanton conduct' and 'gross negligence' interchangeably to describe conduct that falls somewhere between ordinary negligence and intentional conduct." *Yancey*, 354 N.C. at 52, 550 S.E.2d at 157. Finally, "[a]n act or conduct rises to the level of gross negligence when the *act* is done purposely and with knowledge that such act is a breach of duty to others, i.e., a *conscious* disregard of the safety of others." *Id.* at 53, 550 S.E.2d at 158.

When a law enforcement officer is engaged in a high speed vehicle operation under N.C.G.S. § 20-145, "the law enforcement officer must conduct a balancing test, weighing the interests of justice in apprehending the fleeing suspect with the interests of the public in not being subjected to unreasonable risks of injury." *Parish*, 350 N.C. at 236, 513 S.E.2d at 550; *see also Haynes v. Hamilton Cty.*, 883 S.W.2d at 613 ("[P]ublic safety is the ultimate goal of law enforcement, and . . . when the risk of injury to members of the public is high,

that risk should be weighed against the police interest in immediate arrest of a suspect.").[8]

Considering the precedent of this Court, I believe gross negligence can be found on the spectrum of liability beyond ordinary negligence while not reaching recklessness. The Supreme Court of the United States noted gross negligence and recklessness often share the same characteristics. *See Farmer v. Brennan*, 511 U.S. 825, 836 n.4 (1994) ("Between the poles [of negligence and purpose or knowledge] lies 'gross negligence' too, but the term is a 'nebulous' one, in practice typically meaning little different from recklessness as generally understood in the civil law . . . ."). However, in North Carolina, recklessness

> is distinguished from negligence by the degree of certainty that a bad outcome will occur as a result of defendant's misconduct and the ease with which it could have been avoided. The more certain the bad outcome and the easier it is to avoid, the more likely the defendant is guilty of heightened culpability.

David A. Logan & Wayne A. Logan, *North Carolina Torts*, § 6.20, at 159 (2d ed. 2004). Specifically, "reckless disregard of safety" is defined as:

> [A]n act or intentional[] fail[ure] to do an act which it is [the actor's] duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

Restatement (Second) of Torts, § 500, at 587 (1965). However, the Restatement also relates that reckless misconduct differs

> from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves

---

8. Similarly, in accordance with the Highway Patrol, troopers are required to conduct a balancing test when deciding whether to engage in "Extraordinary Patrol Vehicle Operations," including the "nature and gravity of the offense or situation" and external physical conditions (such as the weather, nature of the neighborhood, and pedestrian or vehicular traffic density). Highway Patrol § III. The Highway Patrol also specifically states that when responding to an emergency, "[Troopers] shall not exceed the posted speed limit when . . . responding to a request for assistance unless the imminent danger to human life or the public safety outweighs the considerations above." *Id.* § VI.B.

a risk substantially greater in amount than that which is necessary to make his conduct negligent.

*Id.* § 500 cmt. g. "[T]hat negligence" referenced in the above passage is gross negligence, meaning negligent behavior beyond ordinary negligence but not satisfying the definition of recklessness.

Unfortunately, the majority's attempted clarification of gross negligence jurisprudence in the instant case leaves gross negligence analysis more confusing than ever before. In relying upon a punitive damages statute which is completely inapplicable to the instant case, this Court has once again departed from precedent as to the definition of gross negligence. Gross negligence in North Carolina now encompasses actions which do not necessarily reach the level of willful and wanton conduct. The majority then blurs gross negligence further by evaluating Officer Kelly's actions using the supposedly discarded terms "wicked purpose"[9] and "wanton conduct." Where this places the already elusive definition of gross negligence remains a question unanswered by the majority in the instant case. I, therefore, submit gross negligence in North Carolina is meant to encompass actions well beyond ordinary negligence and that nearly reflect a conscious disregard for the safety of others, which is apparent in the instant case by Officer Kelly's operation of his vehicle.[10]

---

9. Clearly, gross negligence cannot include an analysis of an actor's "wicked purpose" because doing so would attribute a factually reckless or malicious state of mind to gross negligence liability. This analysis would preclude recovery by an individual against a law enforcement officer unless the officer committed an act that not only subjected him or her to civil liability, but possibly to criminal responsibility as well. Surely, this could not be the intended effect of N.C.G.S. § 20-145.

10. An alternative method of evaluating gross negligence is to analyze the level of diligence owed by Officer Kelly to the public. This Court has explained:

It is said that gross negligence is "ordinary negligence with a vituperative adjective." It would, perhaps, be more logical to apply the adjective of comparison to the term "diligence" rather than to the correlative term, "negligence." . . . Thus, where the exercise of great diligence is the duty imposed, a slight omission of care—*i.e.,* slight negligence—will be regarded as a failure to exercise commensurate care. . . . When only slight diligence is required, there must be a gross omission of diligence—an omission of almost all diligence—in order to . . . constitute negligence . . . .

"Slight diligence is that which persons of less than common prudence or, indeed, of any prudence at all, take of their own concerns." . . . It is probably safe to say that the diligence shown in their own affairs by men careless in their habits, and not necessarily prudent by nature, but of ordinary intelligence, is slight diligence.

*Shapiro & Smith,* 168 N.C. at 87-88, 168 N.C. at 30, 84 S.E. at 36. According to this analysis, a person who owes a duty of great diligence, such as Officer Kelly in the instant case, fails to exercise the appropriate standard of care if the person

**JONES v. CITY OF DURHAM**

[360 N.C. 81 (2005)]

Application of Gross Negligence in the Instant Case

It is well established that on a motion for summary judgment, the trial court is required to view the evidence forecast in the light most favorable to the nonmoving party. *Parish*, 350 N.C. at 236, 513 S.E.2d at 550. Further, all inferences must be resolved against the movant. *Holley v. Burroughs Wellcome Co.*, 318 N.C. 352, 355-56, 348 S.E.2d 772, 774 (1986); *Kidd v. Early*, 289 N.C. 343, 352, 222 S.E.2d 392, 399 (1976).

In the instant case, defendants' motion for summary judgment as to plaintiff's gross negligence claim was properly denied by the trial court after a consideration of *all* relevant evidence presented; however, the Court of Appeals erroneously reversed the trial court's denial of summary judgment. Regrettably, today's majority opinion omitted certain facts found in the record that were presented to the trial court at the time of defendants' motion for summary judgment. Therefore, in keeping with our Court's duty to consider all materials in evaluating a party's motion for summary judgment, my analysis and conclusion differ significantly from the majority's. *Dendy v. Watkins*, 288 N.C. 447, 452, 219 S.E.2d 214, 217 (1975) ("When the motion for summary judgment comes on to be heard, the court may consider the pleadings, depositions, admissions, affidavits, answers to interrogatories, oral testimony and documentary materials . . . .").

The speed with which Officer Kelly operated his vehicle during the incident in question is not an all-inclusive range of forty-five to sixty miles per hour. The record reflects the specific speed of Officer Kelly's vehicle at specific locations up until the point of impact with the pedestrian-plaintiff. This speed determination was rendered from an accident reconstruction expert's scientific calculations as to defendant's vehicular speed based upon Durham Police Department video footage reflecting the vehicle's travel over specific periods of

---

makes a slight or minimal omission of care. In the alternative, this Court also equates finding an individual grossly negligent with finding an individual owed only slight diligence to the injured party. Thus, by applying a gross negligence standard in the instant case, the majority asserts Officer Kelly owed a duty of only slight diligence to the public; that is, Officer Kelly is treated as a person "of less than common prudence" or who is "careless in [his] habits." *Id.* I cannot agree that a law enforcement officer, operating his vehicle at speeds as high as seventy-four miles per hour on a populated urban road, should be held to the standard of a buffoon. Rather, Officer Kelly's occupation and actions taken in the instant case imposed upon him a duty of great diligence, and a slight omission of care by Officer Kelly should subject him to liability.

time. For example, at the time Officer Kelly approached the railroad tracks, the record reflects he was traveling approximately seventy-three miles per hour; at the point of impact with Ms. Jones, Officer Kelly was traveling between forty-five and sixty miles per hour. Disregard of such specific and reliable scientific data and subsequent use of one general range of speed is duplicitous and misconstrues the factual circumstances surrounding Officer Kelly's actions. Therefore, our analysis of Officer Kelly's operation of the vehicle with regards to speed should not be restricted solely to the point in time at which Officer Kelly struck Ms. Jones.

The majority in the instant case creates three dispositive factors for gross negligence analysis and evaluates each factor independently, rather than applying the totality of circumstances analysis which has been historically associated with negligence jurisprudence. *See* Charles E. Daye & Mark W. Morris, *North Carolina Law of Torts*, § 16.20, at 155-56 (2d ed. 1999) ("Negligence is necessarily a relative term, and every case of negligence is controlled by its own set of facts. . . . [T]hus, all surroundings or attendant circumstances must be taken into account."). Therefore, the factors in the instant case are interrelated and dependent and cannot be evaluated in isolation to determine whether gross negligence occurred. Accordingly, I would submit the totality of Officer Kelly's actions in responding—from the speeding at up to seventy-four miles per hour through a densely populated area at nine o'clock in the morning, to the loss of control of his vehicle when it went airborne at the railroad tracks, to the subsequent driving on the wrong side of the road, and through the failure to brake before striking a pedestrian—collectively reflects gross negligence and demonstrates a pattern of reckless disregard for the safety of all citizens.

As previously set out, each time this Court has applied the gross negligence standard under N.C.G.S. § 20-145, the Court addressed law enforcement pursuit activities rather than routine response calls. Thus, the majority's direct application of this precedent to the present case is misplaced. A pursuit activity entails a greater sense of urgency on the part of law enforcement personnel because of a known danger presented to society by a fleeing suspect. A response activity, especially when the responding officer is unaware of the situation to which he or she is responding, does *not* present nearly the same urgency as the pursuit of a known, fleeing law violator. Thus, because of the general lack of exigent circumstances characteristic of response activities, as compared to pursuit activities, the standard

of care as to the former should not be given the same deference as that applied to the latter.[11]

The differentiation in analysis between pursuit and response activities is not only grounded in common sense, but also in the very law enforcement policies then governing Officer Kelly's conduct. The Durham Police Department distinguishes pursuit-related officer conduct from response-related officer conduct. The different activities have separate and dissimilar lists of factors to consider when participating in such activities. For example, police pursuits in Durham are allowed only when "the police officer reasonably believes that the violator has committed a violent felony . . . **and** the officer reasonably believes that, by the nature of the crime(s) committed, the violator poses a threat of serious injury to the public or other police officers if he/she is not apprehended immediately." Durham Police Dep't, Gen. Order 4019 R-2 at 3. Even if Officer Kelly's actions were construed as a pursuit, he was in contravention of his own department's policies that were designed to regulate his conduct. He had no knowledge a crime had been committed, much less a violent felony. Once a pursuit has begun, Durham also requires its officers to consider factors such as whether the identity of the violator is known, the likelihood of a successful stop, external conditions (such as population density, road conditions, and weather), and officer-specific factors (such as an officer's driving skills, his or her familiarity with the roads, and the condition of the officer's vehicle)—all of which weigh against the actions taken by Officer Kelly. *Id.* at 4-5.

Contrary to pursuit requirements, Durham lists more general considerations for officers when engaging in routine response situations, such as the unpredictable reaction of civilian drivers, the officer's view of all lanes of traffic at intersections, road conditions, and the increased hazard of driving left of the center line. Durham Police Dep't, Gen. Order 4051, at 2-3. Most telling, the Durham Police Department has recently amended General Order 4051 governing emergency vehicle operation to include a provision directly applicable to the present case: "All officers responding to calls shall limit the speed of their vehicle to a maximum of 15 miles per hour above the posted speed." *Id.* 4051 R-1, at 3 (Jan. 10, 2005). Though this "subsequent remedial measure" could not be considered as evidence of neg-

---

11. While law enforcement pursuit activities present a greater sense of urgency than mere law enforcement response activities, it is the unfortunate reality that "[s]erious injury, property damage and death often result from pursuits and/or emergency responses." Keller Mark McGue & Tom Barker, *Emergency Response and Pursuit Issues in Alabama*, XV Am. J. of Police, No. 4, at 79, 79 (1996).

ligence by the City of Durham or Officer Kelly under the North Carolina Rules of Evidence, *see* N.C. R. Evid. 407; *Lowe v. Elliott*, 109 N.C. 422, 424, 109 N.C. 581, 584, 14 S.E. 51, 51-52 (1891), I commend the Durham Police Department for its recognition of the need for such an amendment mandating that their officers' routine response calls be executed consistent with their responsibility to act with due regard for the safety of others.

Further, the majority relies upon the North Carolina Justice Academy's *Basic Law Enforcement Training Manual* to justify Officer Kelly's evasive maneuver taken to avoid hitting the plaintiff. However, while "[e]vasive steering or sudden lane change" is one accepted method of collision avoidance for law enforcement vehicular operations, the acceptable method of collision avoidance listed first in the manual is "[q]uick, sudden braking." N.C. Justice Acad., *Basic Law Enforcement Training: Student* § 18F, at 48. The BLET Manual, required by the North Carolina Administrative Code, 12 NCAC 9B .0205(c) (June 2004), to be used in all North Carolina law enforcement training courses, also specifically states: "In those instances where an emergency driving response is justified, the officer should remember that excessive speeds are seldom, if ever, warranted during the response." N.C. Justice Acad., *Basic Law Enforcement Training: Student* § 18F, at 52. In the instant case, Officer Kelly's actions were not only contrary to his own department's mandate, but also statewide BLET policies.

Additionally, Officer Kelly was engaged in a response activity at approximately 9:00 in the morning. This difference in time between the instant case and the majority's cited precedent, all of which concern nighttime incidents, is crucial to the analysis of this case because of the difference in pedestrian and vehicular traffic density on public roads at the different times. I cannot agree with the majority's assertion that high speed vehicular activity is more dangerous at the quiet, desolate hour of 4:00 a.m. than it is at 9:00 a.m., during the beginning of the work day.

Evaluating the different actions or circumstances leading up to the traffic accident in the present case, and applying the facts to our jurisprudence in the light most favorable to the plaintiff, it is clear to me defendant's actions rise to the level of gross negligence, if not pure recklessness. Specifically, the record reflects that:

1. When Officer Kelly responded to Officer Fox's call for backup at about 9:00 a.m. on 15 September 2000, Officer Kelly was approximately two and one half miles away from Officer Fox's

location, and he knew or should have known of the eight additional officers who were also responding to the call;

2. Officer Fox was not alone at the scene of the domestic disturbance complaint, but was accompanied by Officer McDonough at the time she requested backup;

3. Officer Kelly knew or should have known the posted speed limit on the street where the traffic accident occurred was in fact thirty-five miles per hour. Further, he admitted during deposition any speed over forty-five miles per hour on this particular stretch of street would constitute disregard for the safety of others;

4. An accident reconstruction expert estimated Officer Kelly's speed over the course of his travel to be anywhere from forty-five miles per hour to seventy-four miles per hour;

5. Officer Kelly, based upon his familiarity with the area, knew or should have known the section of the road on which he was speeding was a densely populated urban area, especially near the railroad tracks where a tree was located and people frequently were "hanging out";

6. Officer Kelly knew or should have known there was an incline at the railroad tracks followed by a "serious dip" which he was about to cross, he could not see any pedestrians until he came over the hill, and the intersection after the railroad tracks was complex in design;

7. Due to the manner of operation and excessive speed, Officer Kelly lost control of his vehicle, causing his vehicle to go airborne after proceeding over the railroad tracks;

8. At the point of impact with the pedestrian, Officer Kelly was operating his vehicle on the wrong side of the road, had not applied his brakes, and was traveling at a speed of forty-five to sixty miles per hour; and

9. As a direct consequence of Officer Kelly's actions, the pedestrian was hit by Officer Kelly's vehicle and was thrown six feet into the air, after which she landed on the pavement and came to rest seventy-six feet away from the location where she was struck. The impact of Officer Kelly's vehicle with the pedestrian severely broke the pedestrian's shoulder and both of her legs.

JONES v. CITY OF DURHAM

[360 N.C. 81 (2005)]

As stated above, when determining whether a law enforcement officer acted willfully, the Court must consider whether the totality of the officer's actions was done purposely, knowingly, or "without yielding to reason[,]" and not consider if he intended the ensuing result. *Yancey*, 354 N.C. at 52, 550 S.E.2d at 157; *Foster*, 197 N.C. at 191, 148 S.E. at 37. Officer Kelly operated his police vehicle in the present case knowingly or "without yielding to reason." His unwarranted decision to travel at such a high speed and to take evasive action instead of applying the brakes upon seeing the pedestrian in the street evidences his failure to act without reason and is contrary to recognized law enforcement policy and procedures.

Additionally, the Court of Appeals' reversal of the trial court's order denying summary judgment was incorrect because a reasonable jury could find Officer Kelly acted wantonly or "*needlessly*, manifesting a reckless indifference to the rights of others." *Foster*, 197 N.C. at 191, 148 S.E. at 38 (emphasis added). Surely, Officer Kelly's actions, considering he was engaged in *response* and not pursuit activities, were needless and manifested a reckless indifference for the public. Officer Kelly's knowledge of the area's dense population, the characteristics of the road, his disregard for a safe speed (as high as seventy-four miles per hour in a thirty-five mile per hour zone), and subsequent airborne travel are all factors sufficient to lead a jury to find Officer Kelly acted with a "reckless disregard of the safety of others" and contrary to local and national law enforcement doctrine,[12] the intent of the General Assembly, and our established jurisprudence.

Further, in both the record and at oral argument, it was acknowledged that Officer Kelly's response to Officer Fox's call contradicted the Durham Police Department's Policy on Response Priorities. Durham Police Dep't, Gen. Order 4001. At the time Officer Kelly began his response to Officer Fox, who was accompanied by another officer at the scene, he was aware at least three, and perhaps as many as eight, other officers were independently responding to the initial call for backup. The maximum authorized number of officers permit-

12. IACP specifically requires its officers engaged in response activities to "drive at an appropriately reduced speed whenever necessary to maintain control of their vehicles, taking into account road, weather, vehicle, and traffic conditions; and [to] continually reevaluate these conditions during the response." IACP § 1.27, IV.B. There is no question that allowing one's vehicle to become airborne is a loss of vehicular control. Officer Kelly, with his knowledge of the road, should have reduced his speed to maintain control of his vehicle. His reckless lack of judgment in operating his police vehicle is an abomination to law enforcement policy and procedure.

**JONES v. CITY OF DURHAM**

[360 N.C. 81 (2005)]

ted by Durham Police Department Policy to respond to an initial request for backup that does not specify the number of units needed is three—two officers and one supervisor. *Id.* Accordingly, Officer Kelly's response to Officer Fox's request for assistance, even if it had been executed with due regard for the safety of others, was not in accordance with Durham Police Department Policy to which he was mandated to adhere. By ignoring established policy, Officer Kelly knowingly engaged in an unnecessary response to a call for backup. In the simplest of terms, when a call for backup is made, every officer cannot respond. If they did, the citizens of Durham would find themselves unprotected; this is why Durham limits the number of officers allowed to respond to calls for assistance, an order specifically ignored by Officer Kelly. Thus, Officer Kelly, or any other reasonably prudent police officer in this response situation, should have realized the high rate of speed he elected to operate his vehicle was not only more dangerous than beneficial to public safety, but also completely unnecessary considering the number of officers present at the scene and responding to the call for backup.

I surely do not intend to convey a lack of appreciation for the dangerous and admirable work our responsible law enforcement officers perform on a daily basis. They are truly the thin blue line that protects society from the criminal element, and they should be afforded every reasonable deference. This having been said, when an officer acts with such blatant disregard for public safety, as witnessed in the instant case, I simply cannot turn a blind eye to the resulting harm. As the Supreme Court of Tennessee recognized:

> [P]olice officers have a duty to apprehend law violators and . . . the decision to commence or continue pursuit of a fleeing suspect is, by necessity, made rapidly. In the final analysis, however, a police officer's paramount duty is to protect the public. Unusual circumstances may make it reasonable to adopt a course of conduct which causes a high risk of harm to the public. However, such conduct is not justified unless the end itself is of sufficient social value. The general public has a significant interest in not being subjected to unreasonable risks of injury as the police carry out their duties. We agree with the Texas Supreme Court's observation, that "[p]ublic safety should not be thrown to the winds in the heat of the chase."

*Haynes v. Hamilton Cty.*, 883 S.W.2d at 611 (footnote and citation omitted).

A reasonable juror could find Officer Kelly's actions, from the beginning of his response to Officer Fox's call for backup until his collision with Ms. Jones, were grossly negligent. Officer Kelly acted "without yielding to reason," needlessly, and with a strong degree of certainty that the risk his actions posed to the public outweighed his unwarranted response. Officer Kelly's actions were arguably reckless misconduct according to our precedent, and thus his actions easily satisfy our gross negligence standard.

Regrettably, if the truth be known, Officer Kelly's behavior in total disregard for the rights and safety of others is, in reality, more than gross negligence—it is simply reprehensible conduct. On that day, Officer Kelly was the law, and he acted as he did because he could. The ultimate tragedy is the pedestrian-plaintiff, an innocent bystander, will not have her day in court. I would submit if the shoe were on the other foot, and Officer Kelly was performing his police functions and observed a citizen operating his vehicle in this manner, Officer Kelly would have not only issued a citation for the citizen's reckless behavior, but would have likely placed the citizen in handcuffs and taken him before a magistrate. Therefore, I believe whether Officer Kelly's actions were in fact grossly negligent is a question that should have been submitted to the jury for their determination. Unfortunately, the majority today unnecessarily contorts the facts of the instant case and erroneously applies an ambiguous standard. As a result, the majority's decision leaves our citizens and our courts with one question: If this case is not gross negligence, then what is gross negligence? I respectfully dissent.